**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**
_____

IN RE: ATHENEX, INC. SECURITIES          No.: 21-cv-00337 (LJV-HKS)
LITIGATION

This Document Relates to:                CONSOLIDATED CLASS
All Actions                              ACTION

_____

## <u>REPORT, RECOMMENDATION AND ORDER</u>

This case was referred to the undersigned by the Hon. Lawrence J. Vilardo, pursuant to 28 U.S.C. § 636(b), for all pretrial matters and to hear and report upon dispositive motions. Dkt. #14.

This is a putative securities class action brought pursuant to The Securities Exchange Act of 1934, §§ 10(b) and 20(a), and Rule 10(b) promulgated thereunder, 17 C.F.R. § 240.10b-5. Dkt. #56.

Currently before the Court is defendants' motion to dismiss plaintiff's amended class action complaint. Dkt. #61.

## <u>BACKGROUND</u>

The following facts are taken from the Amended Complaint or are matters of which judicial notice may be taken, including public filings. *See United States v. Am. Soc'y of Composers, Authors & Publishers*, 627 F.3d 69 n.2 (2d Cir. 2010) (taking judicial notice of SEC Form 8-K filing). *See also In re Power Plug Sec. Litig.*, 21-cv-2004 (ER),

2023 WL5577276, at *13 (S.D.N.Y. Aug. 29, 2023) (noting that courts take judicial notice of regulatory filings "for the limited purpose of noting what the documents state, rather than to prove the truth of their contents") (citation and internal quotations omitted).

Defendant Athenex, Inc. ("Athenex") is a "clinical stage biopharmaceutical company working to develop and commercialize new cancer treatments." Dkt. #56, ¶ 22. Athenex's headquarters are in Buffalo, New York. *Id.* At all relevant times, Athenex's stock was publicly traded. Dkt. #56, ¶¶ 30-31.

Defendants Johnson Y.N. Lau, Jeffrey Yordon, Rudolf Kwan, and Timothy Cook were officers or executives of Athenex. Dkt. #56, ¶¶ 22-26. Defendant Lau was the Chief Executive Officer and Chairman of its Board of Directors. Dkt. #56, ¶ 23. Defendant Yordon was the Chief Operation Officer and President of the Pharmaceutical Division. Dkt. #56, ¶ 24. Defendant Kwan served as Athenex's Chief Medical Officer. Dkt. #56, ¶ 25. Defendant Cook was Senior Vice President of Global Oncology. Dkt. #56, ¶ 26.

**<u>Athenex's Acquisition and Development of Oraxol</u>**

Oraxol is a drug taken in capsule form that delivers a cancer-fighting agent called "paclitaxel." Dkt. #56, ¶ 34. Since the 1990s, paclitaxel has been used intravenously to treat cancers. Dkt. #56, ¶ 34. However, intravenous administration of paclitaxel has adverse side effects, including: (1) "neutropenia," a drop in a type of white blood cell, and (2) peripheral neuropathy ("*i.e.*, damage to the body's peripheral nervous system) which in paclitaxel patients manifests itself as numbness and tingling of the

patients' hands and feet." Dkt. #56, ¶ 35. Such infusions are also time consuming and require patients to travel to properly equipped medical facilities. *Id.*

Oral delivery of paclitaxel, however, also presents problems. A protein in human cell membranes called "P-glycoprotein" interferes with the body's absorption of paclitaxel. Dkt. #56, ¶ 36. A South Korean company, Hanmi, developed an inhibitor called "encequidar" which prevents the protein from interfering with that absorption. *Id.* "Oraxol" combines paclitaxel and encequidar. Dkt. #56, ¶ 28.

Athenex licensed Oraxol from Hanmi in 2011 and conducted Phase 1 and 2 studies testing it on metastatic breast cancer patients. Dkt. #56, ¶ 29.

In December 2015, Athenex began a Phase 3 trial with Oraxol. Dkt. #56, ¶ 37. This trial was conducted in ten countries in Latin America, eventually enrolling 402 metastatic breast cancer patients. *Id.* The patients were divided into two groups: 265 patients were given Oraxol three times a week, and 137 patients were given an intravenous infusion of paclitaxel every three weeks. *Id.* "The primary endpoint" of the trial was to determine how tumors responded to the treatment, as assessed by an independent radiology imaging center using generally accepted criteria for tumor reduction. *Id.*

"One common method of reviewing data and eliminating or reducing bias [in drug trials] is through the use of a Blinded Independent Central Review ("BICR"), a

third party that reviews clinical data and makes assessments." Dkt. #56, ¶ 58. Athenex retained Intrinsic Imaging LLC, a Massachusetts-based laboratory, as its BICR to assess the "Objective Response Rate ("ORR")" in the Phase 3 trial. Dkt. #56, ¶¶ 58-59.

In the meantime, Athenex went public in June 2017, "selling 6.9 million shares of common stock at $11 per share and raising approximately $64 million in an initial public offering ("IPO"), to fund operations, including the continued development of Oraxol." Dkt. #56, ¶ 30.

On October 5, 2017, Athenex issued a press release announcing that an independent "Drug Safety Monitoring Board ("DSMB")" had unanimously recommended continuation of the Phase 3 trial based, in part, on positive data about "the safety profile between Oraxol and IV paclitaxel" and the better neuropathy outcome with Oraxol. Dkt. #56, ¶ 38.

On January 16, 2018, Athenex issued another press release announcing that the FDA had "provided positive feedback on the design of the currently ongoing Phase III Clinical Trial for Oraxol." Dkt. #56, ¶ 39. The release stated that the FDA had "indicated that if the study [met] the primary endpoint with an acceptable Benefit/Risk profile, it could be adequate as a single comparative trial to support registration of Oraxol for a metastatic breast cancer indication in the United States." *Id.* Athenex stated that this positive feedback "would allow an Oraxol US registration submission upon successful

completion of this single Phase III study." *Id.* The release quoted defendant Lau as saying that this feedback "provides further validation of our regulatory pathway for Oraxol." *Id.*

Athenex sold an additional 4.765 million shares in a second public offering ("SPO") on January 25, 2018. Dkt. #56, ¶ 31.

On February 15, 2018, Athenex announced more positive developments regarding patient recruitment for the Phase 3 trial and a review of interim data by the DSMB. Dkt. #56, ¶ 40. The release quoted defendant Kwan as stating that "the unanimous recommendation by the DSMB to continue this study represents the achievement of another critical milestone for Oraxol." *Id.*

Athenex's Phase 3 trial of Oraxol concluded on July 25, 2019. Dkt. #56, ¶¶ 3, 37, 41.

**<u>The Beginning of the Class Period: August 7, 2019</u>**

On August 7, 2019, Athenex issued a press release titled "Athenex Announces Oral Paclitaxel and Encequidar had a Significantly Higher Response Rate Over IV Paclitaxel in a Phase III Pivotal Study in Metastatic Breast Cancer." Dkt. #56, ¶ 41. The release was attached as an exhibit to the Company's Form 8-K filed with the SEC. Dkt. #56, ¶ 92. This release stated:

- The Phase 3 "topline data show[ed] that [Oraxol] met the primary efficacy endpoint with statistically significant improvement over IV paclitaxel;"

- The results showed that "35.8% of the patients administered Oraxol responded to the treatment, compared with 23.4% of the patients administered IV paclitaxel," and the "proportion of confirmed responders with a duration of response of more than 150 days was 2.5 times higher in the Oral Paclitaxel group than in the IV paclitaxel group;"

- Based on "the data cut-off on July 25, 2019, there was a strong trend in progression-free survival . . . and . . . in overall survival . . . favoring Oral Paclitaxel over IV paclitaxel, and "a higher proportion of patients on Oral Paclitaxel compared with IV paclitaxel remained progression-free and Athenex expect[ed] the PFS and OS[1] trend [to] continue to improve upon follow-up;"

- The "Oral Paclitaxel group had lower incidence and severity of neuropathy, alopecia, arthralgia and myalgia compared to IV paclitaxel;" and

- The "incidence of neutropenia was similar in both groups, although there were more incidents of grade 4 neutropenia and infection in the Oraxol group as well as more gastrointestinal side effects."

Dkt. #56, ¶¶ 41, 63, 92.

This press release quoted defendant Kwan as "stating that Athenex would be 'preparing [its] NDA[2] submission as soon as possible." Dkt. #56, ¶¶ 41, 93. It quoted defendant Lau as stating that "***Oral Paclitaxel has the potential to represent a new class of oral anti-cancer drugs***," and "a potential . . . to serve as a cornerstone in chemotherapy in combination with other small molecule anti-cancer drugs, biologics, and immune-oncology treatment approaches, including other drug candidates in [the Company's] oncology pipeline." Dkt. #56, ¶¶ 65, 94.

---

[1] "PFS" is an acronym for "progression-free survival," and "OS" is an acronym for "overall survival." Dkt. #56, ¶ 41, n.7.

[2] "NDA" is an acronym for "new drug application." Dkt. #56, ¶ 4.

The same day, Athenex held its second quarter 2019 earnings call, during which defendant Lau "praised 'the positive top line results' achieved in the Phase 3 trial." Dkt. #56, ¶ 66. Defendant Lau stated that the trial "***successfully met its primary endpoint, showing a statistically significant and clinically meaningful improvement versus IV paclitaxel***." *Id.* Lau continued:

> The successful outcome in this trial is a potentially transformative event for Athenex. ***We are currently analyzing the full dataset, but we believe that we are supportive of an NDA filing in metastatic breast cancer. We plan to request a pre-NDA meeting as soon as possible and plan to present the data at a major upcoming scientific meeting.*** . . .
>
> By demonstrating a benefit over conventional IV paclitaxel, ***we now have conclusive evidence from a large randomized study that our technology allows for optimal therapeutic levels of drug exposure via oral delivery***, and the results of this is [*sic*] better outcomes for patients. . . .
>
> This positive result serve[s] as a validation for our Orascovery approach, which we believe will establish a new paradigm in the use of oral anticancer drugs for cancer treatments.

Dkt. #56, ¶¶ 67, 95.

In the same call, defendant Kwan stated that Athenex was "working diligently to complete [Oraxol's] NDA submission so that [the Company could] file as soon as possible." Dkt. #56, ¶¶ 68, 96. He emphasized that "***the FDA previously provided positive feedback to Athenex that they would accept the results of this one pivotal trial for license application in the U.S. if the primary endpoint is met***," and "we already fulfill[ed] our mutual agreement with U.S. FDA that we met our primary endpoint." *Id.*

Lau further stated that "the favorable data on progression-free survival

~ 7 ~

("PFS") and overall survival ("OS") "represent[ed] potential upside" but was "not required." *Id.* In turn, Kwan "touted the integrity of the Trial's data and the Company's BICR," noting that the scan interpretations were "completely blinded" as to which group patients were in. Dkt. #56, ¶¶ 69, 97.

Lau also asserted, in response to a question about Athenex's "Chemistry, Manufacturing, and Controls" ("CMC") practices, "that all the CMC efforts are all in parallel with the clinical studies" and that nothing would "deter our successful launch." Dkt. #56, ¶¶ 70, 100. Kwan "downplayed the poorer neutropenia results for Oraxol versus IV paclitaxel and touted the better neuropathy results for Oraxol as the game changer." Dkt. #56, ¶ 71.

Finally, "in response to an analyst's question about commercial preparation, Lau stated that Athenex was "well advanced with regard to preparing for the success of the Phase III results," had already hired the leader of the marketing team and "evaluated the how-to approach in terms of the marketing effort" and therefore was "confident that [it] [could] launch the drug the day after the approval." Dkt. #56, ¶ 72.

Plaintiff alleges that defendants made substantially similar statements about the Oraxol Phase 3 trial and NDA in:

- Multiple healthcare conference presentations, including the September 9, 2019 Morgan Stanley Healthcare Conference, and the December 13, 2019 San Antonio Breast Cancer Symposium;

- The Company's press releases and slideshows, including those issued on November 7, 2019, December 13, 2019, February 27, 2020, April

9, 2020, May 7, 2020, August 6, 2020, September 1, 2020, September 8, 2020, November 5, 2020, and December 9, 2020;

- The Company's calls with analysts, including those held on November 7, 2019, February 27, 2020, May 7, 2020, August 6, 2020, September 8, 2020, and November 5, 2020; and

- The Company's September 10, 2020 SPO Offering Documents.

Dkt. #56, ¶¶ 74, 102-157.

**Athenex's Public Statements Regarding Risks and the Uncertainty of FDA Approval for Oraxol**

In its Annual Report on a Form 10-K filed with the SEC on March 2, 2020, Athenex discussed the Phase 3 trial of Oraxol and its intent to file a NDA with the FDA:

> We intend to establish Oral Paclitaxel as the treatment of choice for patients receiving chemotherapy for metastatic breast cancer and intend to file a New Drug Application (NDA) with the U.S. Food and Drug Administration (FDA) in 2020 to secure regulatory approval of Oral Paclitaxel for metastatic breast cancer, ***although we can provide no assurance that we will be successful in obtaining the FDA's approval to commercialize Oral Paclitaxel.***

Dkt. #64-2, p. 5 (emphasis added).

Under "Mission and Strategy," Athenex stated:

> We intend to file an NDA with the FDA in 2020 to secure regulatory approval of Oral Paclitaxel for metastatic breast cancer, and ***if approved***, to establish it as the chemotherapy of choice for patients with metastatic breast cancer. ***If approved by the FDA***, we plan to commercialize Oral Paclitaxel in the U.S. by leveraging our commercialization capabilities in the U.S., and also plan to evaluate marketing options outside of the U.S., including using our internal resources, partnering with others, or out-licensing the product.

Dkt. #64-2, p. 7 (emphasis added).

In a section titled "Commercialization," Athenex stated: "For Oral Paclitaxel, our strategy is to develop and, *if we receive approval from the FDA*, commercialize Oral Paclitaxel in the U.S. by leveraging our Commercial Platform and sales and marketing capabilities established in the U.S." Dkt. #64-2, p. 21 (emphasis added).

Under "U.S. Government Regulation-NDA Approval Processes," the Form 10-K stated:

> ***Notwithstanding the submission of relevant data and information, the FDA may ultimately decide that the NDA does not satisfy its regulatory criteria for approval***. Data obtained from clinical trials are not always conclusive, and the FDA may interpret data differently than the applicant. ***If the agency decides not to approve the NDA in its then present form, the FDA will issue a complete response letter that describes all of the specific deficiencies in the NDA identified by the FDA.*** The deficiencies identified may be minor, for example, requiring labeling changes, or major, for example, requiring additional clinical trials. Additionally, the complete response letter may include recommended actions that the applicant might take to place the application in a condition for approval. ***If a complete response letter is issued, the applicant must either resubmit the NDA, addressing all of the deficiencies identified in the letter, withdraw the application, or appeal the decision.***

Dkt. #64-2, p. 35 (emphasis added).

Under "Risk Factors," Athenex stated:

**Risks Related to Obtaining Regulatory Approval for Our Drug Candidates**

***The regulatory approval processes of the FDA, NMPA and other regulatory authorities are lengthy, time consuming and inherently unpredictable, and if we are ultimately unable to obtain regulatory approval for our drug candidates, our business will be substantially harmed.***

~ 10 ~

. . .

We have not obtained regulatory approval for any drug candidate, and ***it is possible that none of our existing drug candidates or any drug candidates we may discover, in-license or acquire and seek to develop in the future will ever obtain regulatory approval.***

Dkt. #64-2, p. 64 (emphasis added).

On September 1, 2020, Athenex issued a press release announcing that it had filed its NDA for Oraxol with the FDA, which had set a "target action date of February 28, 2021." Dkt. #56, ¶ 143. The release noted that the FDA had granted "priority review" to the application, stating:

The Oral Paclitaxel NDA submission is supported by data from a single pivotal Phase III study of Oral Paclitaxel for the treatment of metastatic breast cancer. The study is a randomized, controlled clinical trial designed to compare the safety and efficacy of Oral Paclitaxel monotherapy versus IV paclitaxel monotherapy. As previously reported, the study achieved its primary endpoint showing statistically significant improvement in overall response rate, along with a lower neuropathy, for Oral Paclitaxel compared to IV Paclitaxel.

Dkt. #56, ¶ 144.

On November 5, 2020, Athenex issued a press release announcing its third quarter 2020 financial results and noting the pending NDA for Oraxol. Dkt. #56, ¶ 147. The release quoted defendant Lau as stating, "Our supply chain is in place and we are finalizing our commercial plans, with the goal of launching in the U.S. upon approval in the first quarter of 2021." Dkt. #56, ¶ 148.

On the earnings call the same day, Lau stated that the "FDA appears supportive of therapies that can help keep patients on therapy in the current pandemic environment" and that the Company's "commercial team [was] now completely focused on putting all the key elements in place for a successful Oral Paclitaxel launch." Dkt. #56, ¶ 149. Defendant Kwan noted that the "[o]ngoing dialogue with the FDA [was] encouraging" and that Defendants were "pleased with our progress to date." Dkt. #56, ¶ 150. Defendant Cook also stated that "[t]he final stages of commercial planning for Oral Paclitaxel [were] underway" and that "[t]he company [was] prepared to launch immediately upon the FDA action date of February 28, 2021 or earlier." Dkt. #56, ¶ 151. Finally, defendant Kwan stated that that the Company had been in "constant contact" with the FDA and **was really focused on "knitting down" the approvals**. Dkt. #56, ¶ 152 (emphasis added).

### Announcement of The FDA Complete Response Letter ("CRL")

On Monday, March 1, 2021, Athenex issued two press releases, one providing fourth quarter and full year 2020 financial results, and another entitled "Athenex Receives FDA Complete Response Letter for Oral Paclitaxel Plus Encequidar for the Treatment of Metastatic Breast Cancer." Dkt. #56, ¶ 75. In the second press release, Athenex explained that the "FDA issues a CRL to indicate that the review cycle for an application is complete and that the application is not ready for approval in its present form." *Id.* The press release stated that the FDA (i) "expressed concerns regarding the **uncertainty** over the results of the primary endpoint of objective response rate (ORR) at

week 19 conducted by blinded independent central review (BICR). In this regard, the [FDA] stated that the BICR reconciliation and re-read process may have introduced **unmeasured bias and influence** on the BICR" and (ii) "recommended that Athenex conduct a new adequate and well-conducted clinical trial in a patient population with metastatic breast cancer **representative of the population of the U.S.**" *Id.*

In addition, the release stated that the FDA had expressed concerns regarding patient safety related to neutropenia and that "additional risk mitigation strategies" would be "required to support approval of the NDA." Dkt. #56, ¶ 76.

In an earnings call that day, defendant Lau stated that Athenex was "surprised and disappointed with the FDA's decision" and that defendants "believe[d] that Oral Paclitaxel demonstrated a superior efficacy and safety profile in a well-controlled Phase III trial setting." Dkt. #56, ¶ 77. He also stated:

> The Athenex team is actively working to analyze and respond to the complete response letter. We will request a meeting with the FDA to discuss its concerns as soon as possible. During the meeting, we hope to align with the FDA on the path forward required to obtain approval. The complete response letter represents a disappointing outcome, not only for us, but also for our colleagues, clinicians and patients who helped facilitate development of Oral Paclitaxel in metastatic breast cancer patients.

Dkt. #56, ¶ 78.

In the wake of these disclosures, Athenex's common stock price dropped from a Friday, February 26, 2021 closing price of $12.10 per share to a Monday, March 1, 2021 closing price of $5.46, a drop of 55%. Dkt. #56, ¶ 80.

This lawsuit was filed two days later. Dkt. #1. On August 5, 2021, the Court granted motions to consolidate the case with a related matter, and it appointed John McKenzie as Lead Plaintiff. Dkt. #46.

On October 11, 2021, "Athenex announced that after meeting with the FDA 'to review with the FDA a proposed design for a new clinical trial intended to address the deficiencies raised in the [CRL] . . . and discuss the potential regulatory path forward for Oral Paclitaxel in mBC in the U.S.,' Athenex had determined not to perform another Phase 3 clinical trial, thereby abandoning its efforts to obtain FDA approval of Oraxol as a treatment for metastatic breast cancer in the U.S." Dkt. #56, ¶ 79.

Plaintiff filed an Amended Complaint on November 19, 2021. Dkt. #56. Plaintiff alleges violations of Section 10(b) of the Exchange Act and Rule 10b-5 against all defendants. Dkt. #56, ¶¶ 172-181. Plaintiff also alleges claims for violations of Section 20(a) of the Exchange Act against the individual defendants. Dkt. #56, ¶¶ 182-186. Plaintiff alleges that he represents a class of persons or entities who acquired Athenex common stock between August 7, 2019 and February 26, 2021 ("the Class Period"). Dkt. #56, ¶ 1.

Plaintiff alleges that there were "significant, undisclosed flaws in the Phase 3 Trial" of Oraxol that created "substantial known, but undisclosed, risks to obtaining FDA

approval, which were well-known within the Company, but not disclosed to the public."

Dkt. #56, ¶¶ 6, 73.

Plaintiff alleges four specific undisclosed risks:

(1) The Company's decision to pursue FDA approval for Oraxol via the abbreviated pathway under 21 U.S.C. § 355(b)(2) ("the §505(b)(2) pathway")[3] without the FDA's prior authorization created a significant risk that the NDA would be rejected or that additional clinical studies would be required. Dkt. #56, ¶¶ 7, 43-50, 73, 101(a), 105(a), 113(a), 117(a), 125(a), 136(a), 142(a), 146(a), 153(a), 156(a), 159(a);

(2) Oraxol's NDA was at significant risk due to multiple undisclosed CMC changes that had been made during the Phase 3 Trial that disrupted the "comparability" between the prior data submitted in Oraxol's Phase 1 and 2 trials and the Phase 3 Trial. Dkt. #56, ¶¶ 8, 51-54, 73, 101(b), 105(b), 113(b), 117(b), 125(b), 136(b), 142(b), 146(b), 153(b), 156(b), 159(b);

(3) The protocols for the evaluation of Trial data injected the potential for bias into the BICR process and risked undermining the certainty and reliability of the data Athenex presented. Dkt. 56, ¶¶ 9, 57-61, 73, 101(c), 105(c), 113(c), 117(c), 125(c), 136(c), 142(c), 146(c), 153(c), 156(c), 159(c); and

(4) There was a significant risk that the FDA would recommend that a new clinical trial of patients representative of the U.S. population be conducted. Dkt. #56, ¶¶ 10, 55-56, 73, 101(d), 105(d), 113(d), 117(d), 125(d), 136(d), 142(d), 146(d), 153(d), 156(d), 159(d).

---

[3] This "abbreviated" pathway permits new drug applications that use "prior date from studies not conducted by the applicant by relying on previous findings by the FDA of safety and effectiveness of an approved drug." Dkt. #56, ¶ 43. "This requires a successful 'bridging' of the new drug to the previously approved drug by means of 'bioequivalence' studies (a/k/a "bridging studies") . . . which are designed to connect the scientific relevance of information developed in a previously approved drug development program to support the product for which an NDA applicant is seeking approval." *Id.* While IV paclitaxel had already been approved by the FDA, encequidar had not. Dkt. #56, ¶ 44.

The Amended Complaint relies, in part, on allegations from three confidential witnesses ("CWs"). Dkt. #56, ¶¶ 43-61.

On January 25, 2022, defendants filed a motion to dismiss, which was fully briefed. Dkt. #61.

On May 26, 2023, Athenex informed the Court that it had filed for Chapter 11 bankruptcy. Dkt. #69. The Court then stayed the case. Dkt. #70.

On June 23, 2023, Plaintiff moved for a partial lift of the stay to pursue the claims against the individual defendants. Dkt. #71. Defendants did not oppose the motion, and the Court partially lifted the stay on September 6, 2023. Dkt. #73.

## DISCUSSION AND ANALYSIS[4]

### Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). It is not enough for a plaintiff to allege facts that are consistent with liability; the complaint must "nudge[ ]" claims "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. To survive dismissal, a complaint's "factual allegations must be enough to raise a right to relief above the speculative

---

[4] This analysis is limited to the claims against the individual defendants, as Athenex's bankruptcy stay remains in place. Dkt. # 73.

level." *Melendez v. Sirius XM Radio, Inc.*, 50 F.4th 294, 306 (2d Cir. 2022). On a Rule 12(b)(6) motion, "all factual allegations in the complaint are accepted as true and all inferences are drawn in the plaintiff's favor." *Apotex Inc. v. Acorda Therapeutics, Inc.*, 823 F.3d 51, 59 (2d Cir. 2016). However, a court does not consider "conclusory allegations or legal conclusions couched as factual allegations." *Dixon v. Blanckensee*, 994 F.3d 95, 101 (2d Cir. 2021).

### Section 10(b) Pleading Requirements

To support a claim for securities fraud, "a plaintiff must plead: (1) a material misrepresentation or omission, (2) scienter, (3) a connection between the misrepresentation or omission and the purchase or sale of a security, (4) reliance on the misrepresentation or omission, (5) economic loss, and (6) loss causation." *Noto v. 22nd Century Grp., Inc.*, 35 F.4th 95, 102 (2d Cir. 2022). "The first two elements must be pled with heightened specificity pursuant to the Private Securities Litigation Reform Act of 1995 and Federal Rule of Civil Procedure 9(b)." *Id.* at 102-03.

Regarding scienter, the PSLRA requires a plaintiff to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). "This standard requires courts to take into account plausible opposing inferences." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 48 (2011). "For an inference of scienter to be strong ... a reasonable person must deem it cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 78 (2d Cir. 2021). "In

making this determination, the court must review all the allegations holistically." *Siracusano*, 563 U.S. at 48.

A plaintiff may plead scienter by "alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *Setzer v. Omega Healthcare Invs., Inc.*, 968 F.3d 204, 213 (2d Cir. 2020). "Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious misbehavior or recklessness by the defendant, though the strength of the circumstantial allegations must be correspondingly greater." *Set Cap. LLC*, 996 F.3d at 83 n.73.

Circumstantial evidence may allow an inference of scienter where defendants "(1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." *Emps.' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015) (citation and internal quotations omitted).

Scienter "requires a showing of intent to deceive, manipulate, or defraud." *Id.* at 305 (citation and internal quotations omitted).

**Material Misrepresentations or Omissions**

Plaintiff alleges that defendants' statements regarding Oraxol's progress towards regulatory approval were materially misleading, not because the statements themselves were false, but because defendants did not disclose alleged flaws in the developmental progress that posed substantial risks that the FDA would not approve Oraxol. Dkt. #56, ¶ 6; Dkt. #66, pp.2, 12.

"In other words, [plaintiff] relies on an omission theory to assert its Exchange Act claims." *Villare v. Abiomed, Inc.*, 19 Civ. 7319, 2021 WL 4311749, at *11 (S.D.N.Y. Sept. 21, 2021). "'The law is well settled that so-called 'half truths'—literally true statements that create a materially misleading impression—will support claims for securities fraud.'" *Id.* (citation omitted).

### *Alleged Actionable Omissions*

Plaintiff's amended complaint lists ten instances when defendants made allegedly actionable statements regarding the Phase 3 trial and Athenex's efforts to obtain FDA approval for Oraxol. Dkt. #56, ¶¶ 92-157.

According to plaintiff, Athenex: (1) touted the design and positive results of Oraxol's Phase 3 trial and specifically noted that the trial met the primary endpoint; (2) stated that the FDA had indicated that, if the results of the trial successfully met its primary efficacy endpoint with an acceptable benefit/risk profile, this single Phase 3 trial could be adequate to support an NDA for Oraxol; (3) assured investors that the BICR process was

vigorous and completely blinded; (4) assured investors that there were no CMC issues; (5) described discussions with the FDA about the NDA as "encouraging," and (6) touted Athenex's plans for the imminent approval of Oraxol. Dkt. #66, p. 12.

Plaintiff alleges that these statements were misleading, in part, because Athenex failed to disclose that its use of the "abbreviated" pathway for approval under Section 505(b)(2) of the Food Drug and Cosmetic Act and changes in its CMC practices during the Phase 3 trial created a risk that the FDA would reject the NDA. Dkt. #56, ¶¶ 43-54.

However, the CRL explaining why the FDA rejected the NDA for Oraxol did not mention either of these two subjects as a basis for its decision. Dkt. #56, ¶¶ 75-76. Plaintiff thus cannot show "loss causation" as to these two alleged omissions, *i.e.*, a causal connection between the omissions and the drop in Athenex's stock price upon news of the FDA's determination. *See Gru v. Axsome Therapeutics, Inc.*, 22 Civ. 3925 (LGS), 2023 WL 6214581, at *4 (S.D.N.Y. Sept. 25, 2023) ("To plead loss causation, a complaint must allege that 'the subject of the fraudulent statement or omission was the cause of the actual loss suffered.'") (citing *Abramson v. Newlink Genetics Corp.*, 95 F.3d 165, 179 (2d Cir. 2020)). *See also Rice, as Tr. of the Richard E. and Melinda Rice Revocable Fam. Tr. 5/9/90 v. Intercept Pharm., Inc.*, 21-cv-0036 (LJL), 2022 WL 837114, at *23 (S.D.N.Y. Mar. 21, 2022) (plaintiffs failed to plead loss causation as to alleged omission where reasons cited by FDA in its CRL denying defendant's NDA did not include subject matter of alleged omission).

Nonetheless, the factual allegations supporting these two theories are fatally vague. Plaintiff relies on allegations by a confidential witness, CW2, who was "a former Senior Regulatory Staffer at Athenex from mid-2018 until the Fall of 2019." Dkt. #56, ¶ 45. CW2 believed that use of the § 505(b)(2) pathway was "seriously problematic" and created a risk that the NDA would be rejected. Dkt. #56, ¶ 45. CW2 discussed these concerns with "outside regulatory consultants" and attended meetings where "comparability issues" with the Phrase 3 trial and prior studies were "openly discussed" amongst members of management, none of whom are defendants in this case. Dkt. #56, ¶¶ 46-48. CW2 then states that these concerns were "escalated" to Athenex's senior leadership, including defendant Kwan, and that defendant Lau was "aware of these issues and their potential to derail FDA approval." Dkt. #56, ¶49.

However, plaintiff stops short of alleging any *facts* that show that any individual defendant knew of these concerns. CW2 does not allege that she ever spoke to any individual defendant or that she has any personal knowledge of what they did, or did not, know or believe regarding use of the § 505(b)(2) pathway. Vague assertions that defendants were "aware" of these issues are insufficient. *Glaser v. The9, Ltd.*, 772 F. Supp.2d 573, 591 (S.D.N.Y. 2011) ("confidential source allegations must show that individual defendants actually possessed the knowledge highlighting the falsity of public statements; conclusory statements that defendants "were aware" of certain information, and mere allegations that defendants "would have" or "should have" had such knowledge is insufficient).

Further, if CW2 left Athenex "in the Fall of 2019," Dkt. #56, ¶ 45, she was not even employed at Athenex during the class period, give or take a month. It is not surprising, therefore, that she would be unable to allege any facts regarding what defendants knew when the allegedly actionable statements were made.

Plaintiff's allegations regarding risks relating to the changes in Athenex's CMC practices are even leaner. Dkt. #56, ¶¶ 51-54. CW2 states that there were "major changes" relating to manufacturing sites and processes, and that she raised concerns about them with her (non-defendant) supervisor and an outside consultant. Dkt. #56, ¶ 53. Another confidential witness, CW3—whose position and dates of employment are not alleged—expressed his "professional opinion" that Athenex's failure to provide sufficient CMC bridging studies to the FDA increased the likelihood of rejection. Dkt. #56, ¶ 54.  Yet these allegations make no mention of the individual defendants or their knowledge.

The amended complaint is similarly nonspecific regarding risks posed by the Phase 3 Trial being conducted outside the United States and the danger of bias infecting the BICR's review of trial data. Dkt. #56, ¶¶ 55-61. According to CW2, the risk that the FDA would require another trial of patients representing the U.S. population was "widely discussed at Athenex," and defendants Kwan and Lau "were aware of this issue as well."  Dkt. #56, ¶ 56. As noted, however, vague allegations regarding defendants'

"awareness" fall short of the stringent pleading requirements for § 10(b) claims. *Glaser*, 772 F. Supp.2d at 591.

The facts regarding the risk of bias in the trial data review are confined to a single paragraph containing information from another confidential witness, CW1. Dkt. #56, ¶ 61. CW1, "a former Clinical Research Associate at Athenex who worked exclusively on the Phase 3 Trial," states that "many conversations" about trial protocol discrepancies occurred between doctors at the trial sites and the BICR firm. *Id.* Again, however, plaintiff makes no allegation regarding any defendant's knowledge of this alleged concern.

Thus, even assuming the truth of these confidential witnesses' factual assertions, their accounts "merely reflected [their] subjective views of how the company should have managed the alleged challenges, not that any of the Defendants' statements were inaccurate at the time they were made or that any defendant believed those statements to be inaccurate when made." *Villare*, 2021 WL 4311749, at *12 (citation omitted).

In sum, plaintiff pleads no facts showing that any individual defendant knew that Athenex's NDA for Oraxol would be rejected by the FDA, or even that they were reckless to that possibility. *See In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp.3d 737, 760 (S.D.N.Y. 2018) ("Even if these statements had contained embedded misleading statements, plaintiffs do not adequately allege that defendants at the start of the Class

Period *knew* the facts that made them so: to wit, that the projected timelines for ENTYCE's commercial release were overly optimistic, or that the [FDA] eventually would request more information regarding Aratana's commercial manufacturer."). *See also In re MELA Sciences, Inc. Sec. Litig.*, No. 10 CV 8774(VB), 2012 WL 4466604, at *13 (S.D.N.Y. Sept. 19, 2012) (dismissing § 10(b) complaint which "alleges no facts demonstrating that defendants' publicly expressed opinions were different than or contradicted by the true opinions of the individual defendants," and noting that plaintiffs "cannot premise a fraud claim upon a mere disagreement with how defendants chose to interpret the results of a clinical trial.").

This conclusion is bolstered by the fact that Athenex expressly warned that FDA approval of Oraxol was not assured—indeed, the company warned that rejection of the Oraxol NDA was possible and that it would substantially harm Athenex's business. Dkt. #64-2, pp. 5, 35, 64. The undisclosed "risks" alleged by Plaintiff thus do not give rise to a claim under § 10(b) and Rule 10(b)(5). *See In re Aratana Therapeutics*, 315 F. Supp.3d at 760 ("Given these comprehensive disclosures of this regulatory risk, the mere fact that the risk materialized cannot support a claim under the Exchange Act.").

### Non-Actionable Opinions or "Puffery"

Defendants also argue that some of the challenged statements are non-actionable opinion or "puffery." Dkt. #62, pp. 16-22.

A statement of "puffery"—that is, "an optimistic statement that is so vague, broad, and non-specific that a reasonable investor would not rely on it"—is not actionable. *Villare*, 2021 WL 4311749, at *13 (citations omitted). "This rule permits companies 'to operate with a hopeful outlook,' because corporate officers 'are not required to take a gloomy, fearful or defeatist view of the future.'" *Id.* (citation omitted). However, "statements regarding 'projections of future performance may be actionable ... if they are worded as guarantees or are supported by specific statements of [then-existing] fact, ... or if the speaker does not genuinely or reasonably believe them." *Id.* "The critical inquiry in determining whether a statement constitutes puffery is 'not whether the topic of a statement was a key to corporate success, but the nature of the specific statement and whether it concretely assured investors of anything.'" *Id.*

In turn, "[e]xpressions of optimism and projections about the future are quintessential opinion statements." *Id.* at *19. Liability for a false statement of opinion may lie if the speaker did not hold the belief professed or the supporting facts he supplied were untrue. *Id.* "As the Second Circuit has firmly rejected the fraud by hindsight approach[,] it is not sufficient for these purposes to allege that an opinion was unreasonable, irrational, excessively optimistic, [or] not borne out by subsequent events." *Id.*

Further, "opinions, though sincerely held and otherwise true as a matter of fact, may nonetheless be actionable if the speaker omits information whose omission makes the statement misleading to a reasonable investor." *Id.* "To adequately allege that a statement of opinion was misleading through the omission of material information, '[t]he

~ 25 ~

investor must identify particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context.' " *Id.*

However, the Supreme Court has "cautioned against an overly expansive reading of this standard, noting that '[r]easonable investors understand that opinions sometimes rest on a weighing of competing facts,' and adding that '[a] reasonable investor does not expect that every fact known to an issuer supports its opinion statement.' " *Id.* Thus, "a statement of opinion 'is not necessarily misleading when an issuer knows, but fails to disclose, some facts cutting the other way.'" *Id.*

Although the parties do not conduct a statement-by-statement analysis, it is clear that some of defendants' assertions are the type of optimistic, broad statements of projections, goals, or expectations that would constitute puffery or opinion under Second Circuit law:

- "We are excited by the positive results in the Phase III pivotal study." Dkt. #56, ¶ 93;

- "And we are very pleasantly surprised that we got such a strong trend even at this early stage." Dkt. #56, ¶ 99;

- "[T]he anticipated Oraxol NDA was 'on track.'" Dkt. #56, ¶ 106;

- "We are moving ahead confidently towards our first NDA submission for our oral discovery platform . . . . We believe it will be competitive and has the potential to become a cornerstone in the treatment of metastatic breast cancer." Dkt. #56, ¶ 109.

- "So we are very confident with regarding the clinical data set as it stands to fulfill whatever the FDA would need for approval." Dkt. #56, ¶ 121.

- The Oraxol NDA "will come very soon, pending our discussion with the FDA, which I have full confidence that this is going to come very soon." Dkt. #56, ¶ 124.

- "Oral paclitaxel is an exciting launch that has the potential to be practice changing." Dkt. #56, ¶ 139.

In *Tongue v. Sanofi*, for example, the Second Circuit held that optimistic statements by a pharmaceutical company regarding the expected timing of approval of a new drug, the timing of the launch of the drug, and its view of the trial results were non-actionable opinions even though the company had not disclosed certain concerns expressed by the FDA regarding the drug's trials. 816 F.3d 199, 210-14 (2d Cir. 2016). As to the expected approval of the drug, the Court stated: "That such a dialogue [with the FDA] was ongoing did not prevent Defendants from expressing optimism, even exceptional optimism, about the likelihood of drug approval." *Id.* at 212.

The Court further held that defendants' statements that the drug demonstrated a "strong and robust treatment effect" and that "the data are nothing short of stunning" were not "misleading simply because the FDA disagreed with Defendants' interpretation of the data; an issuer is not liable merely because it knows, but fails to disclose, some fact cutting the other way." *Id.* at 214 (citation and internal quotations omitted).

Thus, defendants' opinions regarding Oraxol's trial results and the prospects for FDA approval are not actionable.

**Scienter**

**_"Motive and Opportunity"_**

A complaint may plead scienter under the "motive and opportunity" prong by pleading facts "showing that the defendant benefited in some concrete and personal way from the purported fraud." _Villare v. Abiomed, Inc._, 19 Civ. 7319 (ER), 2021 WL 4311749, at *21 (S.D.N.Y. Sept. 9, 2021) (citation and internal quotations omitted).

Plaintiff does not allege that any individual defendant benefited personally from the alleged fraud in this matter. Instead, he alleges that defendants were motivated to keep Athenex's share price elevated so that the company could raise more money–through financing and a second public offering–to continue to fund Athenex's operations. Dkt. #56, ¶¶ 87-90.

However, it is well established in this Circuit that "general motives common to most corporate officers do not constitute 'motive' for the purpose of establishing scienter." _Villare_, 2021 WL 4311749, at *21 (citation omitted). _See also Russo v. Bruce_, 777 F. Supp.2d 505, 520 (S.D.N.Y. 2011) (holding that executives' alleged desire to inflate the price of company stock so that company could sell stock to raise cash "comfortably fits within the set of universal corporate motivations that are inadequate to sustain a securities fraud complaint"); _Tamar v. Mind C.T.I., Ltd._, 723 F. Supp.2d 546, 555 (S.D.N.Y. 2010) (motives such as attracting customers, financing current operations, and pursuing strategic acquisitions "have been routinely rejected by Courts within the Second Circuit as insufficient to establish scienter").

### *Circumstantial Evidence*

"Where, as here, a plaintiff fails to allege a motive to commit fraud, the plaintiff's allegations that indicate a defendant's conscious misbehavior or recklessness 'must be correspondingly greater.'" *Villare*, 2021 WL 4311749, at *22 (citation omitted).

In order to establish scienter under this prong, a plaintiff "must show conduct by defendants that is at least highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Id.* (citation and internal quotations omitted). Recklessness in the scienter context, however, "cannot be merely enhanced negligence.'" *Id.* (quoting *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 624 (S.D.N.Y. 2005)). *See also Medis Inv. Grp. v. Medis Tech., Ltd.*, 586 F. Supp. 2d 136, 142 (S.D.N.Y. 2008) ("To properly allege recklessness, the plaintiff must plead 'a state of mind approximating actual intent, and not merely a heightened form of negligence.'").

Plaintiff relies heavily on the statements from the three confidential witnesses, discussed above, to support his allegation that defendants knew or recklessly disregarded that "the Phase 3 Trial was deeply flawed and there was a substantial risk that Oraxol's NDA would be rejected or that the FDA would require additional clinical studies based on these undisclosed flaws." Dkt. #56, ¶ 42.

~ 29 ~

However, the allegations of the confidential witnesses do not "connect the dots" between the alleged flaws underlying the NDA and any knowledge or recklessness on defendants' part. Such allegations are thus insufficient to support a strong inference of scienter. *See Villare*, 2021 WL 4311749, at *23 (noting that the account of confidential witnesses "largely reflect the subjective assessments of the confidential witnesses themselves—not the mental states of [defendants]."); *In re Adient PLC Sec. Litig.*, No. 18-CV-9116, 2020 WL 1644018, at *27 (S.D.N.Y. April 2, 2020) (holding that plaintiffs failed to allege facts supporting inference of scienter where they did not allege that confidential witnesses ever told defendants about their operational concerns or that defendants ever "admitted, suggested, or believed" such concerns).

Plaintiff's remaining allegations, Dkt. #56, ¶¶ 81-90, fare no better. Plaintiff alleges a "potential" conflict of interest in defendants' selection of a clinical research organization involved in the Phase 3 trial because it was a related entity. Dkt. #56, ¶¶ 82-86. But plaintiff does not explain how this relates to any knowledge or recklessness on defendants' part regarding Oraxol's prospects for approval by the FDA.

Plaintiff next asserts Athenex's second public offering "supports an inference of scienter." Dkt. #56, ¶¶ 87-90. This, however, is simply a rehash of the argument raised under the "motive and opportunity" prong of scienter, which is insufficient as a matter of law.

Plaintiff also invokes the "core operations doctrine." Dkt. #66, pp. 29-30. This doctrine "allows courts to draw an inference of scienter where misrepresentations and omissions allegedly made by defendants were about their core operations." *Villare*, 2021 WL 4311749, at *23 (citation and internal quotations omitted).

However, "the Second Circuit has suggested that the doctrine can only provide additional support for an inference of scienter but could not establish scienter on its own." *In re Power Plug Sec. Litig.*, 21-cv-2004 (ER), 2023 WL5577276, at *21 (S.D.N.Y. Aug. 29, 2023) (citation omitted). Where a plaintiff fails to offer "specific factual allegations linking Defendants to the alleged fraud," this doctrine does not satisfy the scienter requirement. *Villare*, 2021 WL 4311749, at *23 (citations omitted).

Moreover, other facts "tend to suggest the absence of fraudulent intent." *In re Aratana Therapeutics*, 315 F. Supp.3d at 765.

For example, none of the individual defendants is alleged to have sold stock during the class period, when its price was allegedly artificially inflated. *See, e.g., Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 309 (2d Cir. 2015) (finding probative as to scienter the fact the individual defendants "reaped a total of over $49 million from the sales of their personal stock during the Class Period").

To the contrary, defendants Lau, Kwan, and Yordon bought company stock during the class period. Dkt. #64-23. "This trading history cannot support a 'cogent and

compelling' inference of fraudulent intent; rather, defendants' purchases of even more GSK stock during the relevant period signals only confidence in the future of their company and, by extension, in the commercial success of Avandia." *Avon Pension Fund v. GlaxoSmithKline PLC*, 343 F. App'x 671, 673 (2d Cir. 2009) (citation omitted); *Abely v. Aeterna Zentris Inc.*, No. 12 Civ. 4711(PKC), 2013 WL 2399869, at *20 (S.D.N.Y. May 29, 2013) (fact that company's officers increased their stock holdings during class period is "wholly inconsistent with fraudulent intent") (citation and internal quotations omitted); *In re MELA Sciences, Inc. Sec. Litig.*, No. 10 CV 8774(VB), 2012 WL 446604, at *5 (S.D.N.Y. Sept. 19, 2012) (fact that no defendant sold shares and all increased their holdings during class period is "inconsistent with an intent to commit fraud").

Finally, the fact that Athenex devoted substantial resources towards preparing for the launch of Oraxol in anticipation of FDA approval weighs against an inference that defendants either knew, or were reckless to the possibility that, approval would not be obtained. Dkt. #56, ¶¶ 148-151.

In sum, an "inference of scienter does not follow from the mere fact of non-disclosure of relevant information." *City of St. Clair Shores Police and Fire Ret. Sys. v. Unilever*, 22 Civ. 5011, 2023 WL 5578090, at *5 (S.D.N.Y. Aug. 29, 2023) (citation and internal quotations omitted). "Unless and until" the individual defendants knew, or had some information suggesting, that rejection of the Oraxol NDA was likely, they "cannot have acted with the requisite scienter in not disclosing" the information upon which plaintiff bases his claims. *Id. See also Lipow v. Net1 UEPS Techs., Inc.*, 131 F. Supp.3d 144, 170

(S.D.N.Y. 2015) ("[W]here an outcome is merely speculative, the duty to disclose does not attach.").

Viewing the allegations "holistically," the "most cogent inference" is that the individual defendants believed that, while the FDA approval process was inherently uncertain, their NDA for Oraxol was strong, stood a very good chance of approval, and would enable Athenex to launch what they expected to be an effective and profitable drug. Plaintiff's attempt to leverage the fact that defendants turned out to be wrong into a securities claim is simply "fraud by hindsight." *In re Aratana Therapeutics*, 315 F. Supp.2d at 761.

It will thus be recommended that plaintiff's § 10(b) and Rule 10(b)(5) claims against the individual defendants be dismissed.

### Section 20(a)

Plaintiff also brings a claim for violation of section 20(a) of the Exchange Act against the individual defendants. This section "imposes liability on individuals who control any person or entity that violates section 10." *Villare*, 2021 WL 4311749, at *24. If a plaintiff has failed to allege a primary violation of the Exchange Act, its claim pursuant to section 20(a) also fails. *Id.*

It will thus be recommended that the Section 20(a) claims against the individual defendants be dismissed.

**Amendment of the Complaint**

In the conclusion of his memorandum in opposition, plaintiff states, "Should the Court grant Defendants' motion to dismiss, Plaintiff respectfully requests leave to amend the complaint pursuant to Rule 15(a)." Dkt. #66, p. 32. This request is not well taken.

Loc. R. Civ. P. 7 requires any party seeking relief to file a motion and notice thereof, and Loc. R. Civ. P. 15(a) requires any movant seeking to amend a pleading to "attach an unsigned copy of the proposed amended pleading as an exhibit to the motion." Plaintiff has not complied with these rules.

Nor does plaintiff state in his opposition how any amendments could cure the deficiencies identified in defendants' motion to dismiss.

It will thus also be recommended that plaintiff's request to amend be denied.

## CONCLUSION

For the foregoing reasons, it is recommended that defendants' motion to dismiss (Dkt. #61) be granted as to defendants Johnson Y.N. Lau, Rudolf Kwan, Timothy Cook, and Jeffrey Yordon.

It is further recommended that Plaintiff's request to amend the complaint be denied.

Therefore, it is hereby ORDERED pursuant to 28 U.S.C. § 636(b)(1) that:

This Report, Recommendation and Order be filed with the Clerk of the Court.

ANY OBJECTIONS to this Report, Recommendation and Order must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report, Recommendation and Order in accordance with the above statute, Fed .R. Civ. P. 72(b) and Local Rule 72(b).

The district judge will ordinarily refuse to consider de novo arguments, case law and/or evidentiary material which could have been, but were not presented to the magistrate judge in the first instance. *See, e.g., Patterson-Leitch Co. v. Massachusetts Mun. Wholesale Electric Co.*, 840 F.2d 985 (1st Cir. 1988).

Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 72(b) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions

of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." <u>Failure to comply with the provisions of Rule 72(b) may result in the District Judge's refusal to consider the objection.</u>

The Clerk is hereby directed to send a copy of this Report, Recommendation and Order to the attorneys for the parties.

**SO ORDERED.**

DATED:   Buffalo, New York
September 29, 2023

<u>s/ H. Kenneth Schroeder, Jr.</u>
**H. KENNETH SCHROEDER, JR.**
**United States Magistrate Judge**