## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| IN RE ATHENEX, INC. SECURITIES LITIGATION<br><br>This Document Relates To:<br><br>    All Actions. | No. 21-cv-00337 (LJV-HKS)<br><br>CONSOLIDATED CLASS ACTION |

## PLAINTIFF'S OBJECTION TO REPORT & RECOMMENDATION

# TABLE OF CONTENTS

I.      INTRODUCTION ...........................................................................................................1

        A.      Statement of Objections to the Report and Recommendation..................................1

        B.      Statement of Facts ........................................................................................2

        C.      Procedural History ........................................................................................5

II.     LEGAL STANDARD ................................................................................................5

III.    ARGUMENT ..............................................................................................................6

        A.      The Amended Complaint Alleges Actionable Misstatements,
                Not Just Omissions ........................................................................................6

        B.      The Magistrate Judge Erred by Determining the Alleged Omissions Were Not
                Actionable........................................................................................................9

        C.      The Amended Complaint Adequately Alleges Scienter........................................21

        D.      Leave to Replead Should Be Granted.................................................................25

IV.     CONCLUSION .........................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
750 F.3d 227 (2d Cir. 2014) ........................................................................................9

*City of Birmingham Relief & Ret. Sys. v. Acadia Pharms., Inc.*,
No. 3:21-cv-00762, 2022 WL 4491093 (S.D. Cal. Sept. 27, 2022) ..........................7, 8, 19, 22

*City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*,
875 F. Supp. 2d 359 (S.D.N.Y. 2012) ........................................................................21

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005) ...............................................................................................9, 11

*Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc.*,
343 F.3d 189 (2d Cir. 2003) .......................................................................................10

*Freudenberg v. E\*Trade Fin. Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010) .....................................................................9, 13

*In re Adient plc Sec. Litig.*,
No. 18-CV-9116, 2020 WL 1644018 (S.D.N.Y. Apr. 2, 2020) ..................................22

*In re Advance Auto Parts, Inc. Sec. Litig.*,
No. 18-212, 2020 WL 599543 (D. Del. Feb. 7, 2020) ...............................................24

*In re Avon Sec. Litig.*,
No. 19 Civ. 01420, 2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019) .............................24

*In re Fannie Mae 2008 Sec. Litig.*,
No. 08 Civ 7831, 2011 WL 13267340 (S.D.N.Y. Apr. 11, 2011)................................23

*In re MannKind Sec. Actions*,
835 F. Supp. 2d 797 (C.D. Cal. 2011) ..................................................................8, 20, 22

*In re MF Glob. Holdings Ltd. Sec. Litig.*,
982 F. Supp. 2d 277 (S.D.N.Y. 2013) ........................................................................23

*In re Nuvelo, Inc. Sec. Litig.*,
668 F. Supp. 2d 1217 (N.D. Cal. 2009)......................................................................19

*In re Omnicom Grp., Inc. Sec. Litlg.*,
597 F.3d 501 (2d Cir. 2010) .........................................................................................9

*In re Teva Sec. Litig.*,
No. 3:17-CV-00558, 2023 WL 3186407 (D. Conn. May 1, 2023) .............................11

*Kelly for Moudy v. Snap-on Inc.*,
   No. 21-CV-729-LJV, 2022 WL 2758308 (W.D.N.Y. July 14, 2022) (Vilardo, J.) ...................................................................................................................25

*Lentell v. Merrill Lynch & Co., Inc.*,
   396 F.3d 161 (2d Cir. 2005) .............................................................................9

*Luce v. Edelstein*,
   802 F.2d 49 (2d Cir. 1986) ..............................................................................25

*MacSwan v. Merck & Co.*,
   602 F. Supp. 3d 466 (W.D.N.Y. 2022)..............................................................25

*Makor Issues & Rts., Ltd. v. Tellabs Inc.*,
   513 F.3d 702 (7th Cir. 2008) ...........................................................................24

*Medina v. Clovis Oncology, Inc.*,
   215 F. Supp. 3d 1094 (D. Colo. 2017) .............................................................23

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000) ............................................................................21

*Okla. Police Pension Fund & Ret. Sys. v. Teligent, Inc.*,
   No. 19 Civ. 3354, 2020 WL 3268531 (S.D.N.Y. Jun. 17, 2020) ............................12

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
   575 U.S. 175 (2015) .......................................................................................20

*Porat v. Lincoln Towers Cmty. Ass'n*,
   464 F.3d 274 (2d Cir. 2006) ............................................................................25

*Rice v. Intercept Pharms., Inc.*,
   No. 21-cv-0036, 2022 WL 837114 (S.D.N.Y. Mar. 21, 2022) ...............................12

*Rihn v. Acadia Pharms. Inc.*,
   No. 15cv00575, 2016 WL 5076147 (S.D. Cal. Sept. 19, 2016)......................19, 20

*Skiadas v. Acer Therapeutics, Inc.*,
   No. 19-cv-6137, 2020 WL 3268495 (S.D.N.Y. June 16, 2020)...................8, 22, 23

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
   551 U.S. 308 (2007) .......................................................................................21

*Tongue v. Sanofi*,
   816 F.3d 199 (2d Cir. 2016) .......................................................................20, 21

*Villare v. Abiomed, Inc.*,
   No. 19 Civ. 7319, 2021 WL 4311749 (S.D.N.Y. Sept. 21, 2021)...........................22

*Wilamowsky v. Take-Two Interactive Software, Inc.*,
818 F. Supp. 2d 744 (S.D.N.Y. 2011) ...............................................................................11

**Statutes & Other Authorities**

28 U.S.C.
§636(b)(1)(C)...................................................................................................................5

21 C.F.R.
§20.61 ..........................................................................................................................10
§314.430(d)(1)..............................................................................................................10

FED. R. CIV. P.
72(b)(3)...........................................................................................................................5

P. Lurie, et al., *Comparison of content of FDA letters not approving applications
for new drugs and associated public announcements from sponsors:  cross
sectional study*, 350 THE BMJ h2758 (June 10, 2015) ...............................................11

Plaintiff John McKenzie ("Plaintiff") respectfully submits this Objection to the Report and Recommendation of Magistrate Judge H. Kenneth Schroeder, Jr. dated September 29, 2023 (the "R&R"), recommending that Defendants' Motion to Dismiss (ECF No. 61) be granted as to Defendants Johnson Y.N. Lau, Rudolf Kwan, Timothy Cook, and Jeffrey Yordon (collectively, the "Individual Defendants"). Plaintiff incorporates by reference his Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Amended Class Action Complaint (Pltff's Mem.) (ECF No. 66).[1]

## I. INTRODUCTION

### A. Statement of Objections to the Report and Recommendation

Plaintiff objects on the following grounds to the R&R's recommendation that the action be dismissed as against the Individual Defendants and that Plaintiff should not be granted leave to amend: (i) the R&R erroneously held that the Amended Complaint alleged only "omissions," ignoring numerous actionable misstatements alleged in the Amended Complaint (*see* R&R at 19; *see infra* §III.A); (ii) the R&R erroneously concluded that Plaintiff cannot show loss causation, an issue not even raised in the motion to dismiss (*see* R&R at 20; *see infra* §III.B.1); (iii) the R&R erroneously concluded that the Confidential Witness ("CW") allegations were "fatally vague" and, therefore, Plaintiff had not alleged actionable omissions or half-truths (*see* R&R at 21; *see infra* §III.B.2); (iv) the R&R erroneously concluded that certain of the challenged statements were puffery or nonactionable opinions (*see* R&R at 26-27; *see infra* §III.B.3-4); (v) the R&R erroneously concluded that the Amended Complaint did not adequately allege the Individual Defendants' scienter (*see* R&R at 28-33; *see infra* §III.C); and (vi) the R&R erroneously denied Plaintiff leave to amend (*see* R&R at 34; *see infra* §III.D).

---

[1] Unless otherwise noted, citations are omitted and emphasis is added.

**B. Statement of Facts**

On November 21, 2021, Plaintiff filed the operative Amended Class Action Complaint (the "Amended Complaint") (ECF No. 56) alleging that Athenex, Inc. ("Athenex" or the "Company"), and certain of its officers and directors, violated §§10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder by making a series of materially false and misleading statements concerning the Phase 3 Trial results for Athenex's lead drug candidate, Oraxol, and the Company's prospects for obtaining U.S. Food and Drug Administration ("FDA") approval of a New Drug Application ("NDA") for Oraxol as a treatment for metastatic breast cancer. Oraxol is a drug in capsule form that combines paclitaxel, an FDA-approved chemotherapy that had to be delivered intravenously, with a new as yet unapproved drug, encequidar, which aids oral absorption of paclitaxel. AC ¶¶2, 34-36.

As detailed in the Amended Complaint (ECF No. 56), and summarized in Pltff's Mem., Plaintiff alleges that Defendants misled investors as to the NDA's prospects for approval through a series of statements repeated throughout the Class Period (i) touting Athenex's purported "agreement" with the FDA that it would accept the Phase 3 Trial results for license application in the U.S. if the primary efficacy endpoint was met; (ii) emphasizing that the Trial met the efficacy endpoint; (iii) describing the Blinded Independent Central Review ("BICR") process in connection with the Phase 3 Trial as both "rigorous" and "completely blinded" and the Chemistry, Manufacturing, and Controls ("CMC") package supporting the NDA as "really strong;" and (iv) stating that the Company's "ongoing dialogue" with the FDA concerning the NDA was "encouraging" and that Defendants were "pleased with the progress to date." AC ¶¶91-157; Pltff's Mem. at 17-20. In fact, however, there was no agreement with the FDA, or Athenex had materially misrepresented its terms as evidenced by the fact that the Oraxol NDA was rejected notwithstanding that the efficacy endpoint had been met. Moreover, there were several significant,

undisclosed flaws in the Phase 3 Trial that created substantial known, but undisclosed, risks to obtaining FDA approval of the Oraxol NDA. In particular:

- Athenex chose to use the abbreviated §505(b)(2) pathway for approval of new drug products that are not entirely novel but have changes compared to an existing approved product such as a new formulation (liquid, tablet, capsule, inhalation, etc.) or indication rather than the usual §505(b)(1) pathway for drugs like Oraxol that have a new, not previously approved active ingredient. Although the §505(b)(2) pathway was more cost-effective because it allowed Athenex to rely on data and/or study results originally collected by another manufacturer or researcher, the Company's choice to use this abbreviated pathway for a drug with a new ingredient was highly unusual and absent prior approval of the FDA, which was never sought, presented a substantial risk to the Oraxol NDA. AC ¶¶7, 43-50.

- During the Phase 3 Trial, Athenex implemented major changes to the CMC used to manufacture Oraxol, which are designed to ensure consistency in the safety and efficacy of manufactured drug products during drug trials and later commercial distribution. Because these changes disrupted the "comparability" of the data between Oraxol's earlier Phase 1 and 2 Trials, on the one hand, and the Phase 3 Trial on the other, Athenex was required to perform adequate "bridging" studies to ensure "comparability," but failed to do so. AC ¶¶8, 51-54.

- Communications pertaining to trial protocol discrepancies including tumor size (the Trial's primary determinant of efficacy) and whether a patient was qualified to remain in the Phase 3 Trial had occurred between doctors at Phase 3 Trial sites, who were unblinded to the data, and Athenex's BICR, Intrinsic Imaging LLC, which was supposed to be blinded,

3

introducing the potential for bias into the review process and risking the certainty and reliability of the Trial's data. AC ¶¶9, 57-61.

- The Phase 3 Trial had been conducted entirely outside the U.S., which required the NDA to demonstrate that "[t]he foreign data [submitted were] applicable to the U.S. population and U.S. medical practice." AC ¶¶10, 55-56.

The undisclosed risk that the Oraxol NDA would not be approved due to these issues with the Phase 3 Trial materialized on March 1, 2021, when Athenex issued a press release before the market opened stating that it had received a complete response letter ("CRL") from the FDA indicating that Oraxol's "application [was] not ready for approval in its present form." Although the CRL itself was not released consistent with federal regulations, Athenex issued a press release that purported to describe the reasons set forth in the CRL for the FDA's decision. According to the press release (i) "[t]he FDA . . . expressed concerns regarding the uncertainty over the results of the primary endpoint of objective response rate (ORR) at week 19 conducted by blinded independent central review (BICR)" noting that "the BICR reconciliation and re-read process may have introduced unmeasured bias and influence on the BICR;" (ii) the FDA "recommended that Athenex conduct a new[,] adequate[,] and well-conducted clinical trial in a patient population with metastatic breast cancer representative of the population in the U.S.;" and (iii) the FDA indicated its concern of safety risk to patients in terms of an increase in neutropenia-related sequelae on the Oral Paclitaxel arm compared with the IV paclitaxel arm." AC ¶¶12. In a conference call with securities analysts the same day, Defendant Kwan characterized the foregoing as the FDA's "main concerns" thereby conceding there were others. ECF No. 64-3 at 5.[2] In response, the price of

---

[2] Athenex, Inc. Q4 2020 Earnings Call Transcript, attached to the Declaration of Douglas W. Greene, Esq. in Support of Defendants' Request for Judicial Notice and Motion to Dismiss Plaintiff's Amended Complaint. ECF No. 64.

Athenex's shares declined 55%, a loss of $620 million in the Company's market capitalization. AC ¶13.

### C. Procedural History

On January 25, 2022, Defendants moved to dismiss the Amended Complaint, arguing that it failed to allege actionable misstatements and omissions or Defendants' scienter. Defendants did not challenge Plaintiff's allegations of loss causation. ECF No. 62. Plaintiff opposed the motion on March 28, 2022 (ECF No. 66), and Defendants filed their reply brief on May 20, 2022 (ECF No. 67).

On May 14, 2023, Athenex and five affiliated companies initiated voluntary Chapter 11 proceedings in the United States Bankruptcy Court for the Southern District of Texas, and on May 26, 2023, Defendants filed a Suggestion of Bankruptcy On the Record (ECF No. 69) leading this Court to stay the action (ECF No. 70). On June 23, 2023, Plaintiff filed a motion to partially lift the stay to permit the action to proceed against the Individual Defendants, which was unopposed. ECF No. 71. On September 6, 2023, this Court entered an Order granting Plaintiff's motion and referred the case back to Magistrate Judge H. Kenneth Schroeder, Jr. consistent with the Court's earlier referral order. ECF No. 73. On September 29, 2023, Magistrate Judge Schroeder issued the R&R recommending dismissal of the action as against the Individual Defendants. ECF No. 74.

## II. LEGAL STANDARD

A district court "may accept, reject, or modify, in whole or in part, the findings and recommendations made by the magistrate judge." 28 U.S.C. §636(b)(1)(C). The court reviews *de novo* those portions of a report and recommendation to which an objection is made. *Id.*; *see also* FED. R. CIV. P. 72(b)(3).

## III. ARGUMENT

### A. The Amended Complaint Alleges Actionable Misstatements, Not Just Omissions

The R&R erroneously held that the Amended Complaint alleged only "omissions," ignoring numerous actionable misstatements alleged in the Amended Complaint. *See* ECF No. 74 ("R&R") at 19 ("Plaintiff alleges that defendants' statements regarding Oraxol's progress towards regulatory approval were materially misleading, ***not because the statements themselves were false, but because defendants did not disclose alleged flaws in the developmental progress*** that posed substantial risks that the FDA would not approve Oraxol."). In particular, the R&R ignored the alleged misstatements concerning Athenex's purported "agreement" with the FDA that it would accept the Phase 3 Trial results for license application if the primary endpoint of the study was met.[3]

There are several such misstatements alleged in the Amended Complaint. For example, on August 7, 2019, two weeks after the Phase 3 Trial's completion date, in a conference call with securities analysts, Defendant Kwan stated that "the FDA previously provided positive feedback to Athenex that they would accept the results of this one pivotal trial for license application in the U.S. if the primary endpoint is met," and Defendant Lau later stated "we have already fulfill[ed] our mutual agreement with U.S. FDA that we met our primary endpoint." AC ¶68. During the same call, Defendant Lau stated that as a result of the study, Athenex had "***achieved already what [the FDA] have asked for***." *See id.* Likewise, on September 9, 2019, in a presentation at the

---

[3] The alleged misstatements involve a number of topics beyond the purported agreement with the FDA, including the CMC used in manufacturing Oraxol and the BICR used in the Phase 3 Trial to eliminate or reduce bias. *See, e.g., id.*, ¶69 (BICR was "completely blinded"); *id.*, ¶70 ("[A]ll the CMC efforts are all in parallel with the clinical studies."); *id.*, ¶104 ("We have solved all the CMC issue[s]. We are ready."). However, these misstatements are based on the CW information and, therefore, will be addressed below.

Morgan Stanley Healthcare Conference, Defendant Lau twice reiterated that Athenex had "an agreement with U.S. FDA that the ORR result would be sufficient for them to approve" the Oraxol NDA. AC ¶102.[4]

The R&R's failure to address these misstatements was significant because the CW allegations, which the R&R found inadequate, were not necessary to allege falsity as to these misstatements. Even assuming *arguendo* that the R&R's conclusions with respect to the CW allegations are correct (they are not), the Amended Complaint adequately alleges Defendants' statements concerning Athenex's purported "agreement" with the FDA were false because that agreement, as described by Defendants, was inconsistent with the FDA's basis for ultimately denying approval: although the Phase 3 Trial met its primary endpoint in terms of ORR, the Oraxol NDA was nevertheless rejected due to other issues with the Phase 3 Trial. *See* AC ¶¶75-76. This fact alone gives rise to a plausible inference at the pleading stage that either Defendants misrepresented the existence of, or the terms of, the purported agreement with the FDA.

A motion to dismiss was denied on strikingly similar facts in *City of Birmingham Relief & Ret. Sys. v. Acadia Pharms., Inc.*, No. 3:21-cv-00762, 2022 WL 4491093 (S.D. Cal. Sept. 27, 2022).[5] In *Acadia*, the plaintiffs alleged that during the class period, Acadia Pharmaceuticals, along with its CEO and President of Research & Development, falsely stated that the FDA had agreed that it would accept the results of a "single, well-controlled study" (Harmony), the results of which were both statistically and clinically very persuasive, as support for a Supplemental New Drug Application ("sNDA") that Acadia was planning to file to expand the treatment indication

---

[4]    ORR – Objective Response Rate – measures the tumor size reduction in patients administered Oraxol and IV paclitaxel and was the Phase 3 Trial's primary determinant of efficacy. AC ¶9.

[5]    Although Plaintiff filed a Notice of Supplemental Authority (ECF No. 68) attaching the *Acadia* decision, it was not addressed in the R&R.

for Acadia's most valuable drug and only commercial product, pimavanserin. The sNDA sought approval to use pimavanserin, which was only approved to treat dementia-related psychosis ("DRP") in patients with Parkinson's disease, to treat patients with any type of DRP. As in this case, plaintiffs in *Acadia* alleged that there was no such agreement, which was evidenced by the FDA's subsequent denial of Acadia's sNDA for pimavanserin on numerous grounds.

Rejecting the *Acadia* defendants' assertions that their descriptions of an agreement with the FDA were true, the court held that "the FAC alleged sufficient facts to support a plausible inference that [defendants'] statements concerning an agreement with the FDA were materially false or misleading" (*id*. at *9) in light of the FDA's denial of the NDA, reasoning:

> The FAC alleges that prior to the FDA's denial of approval of the sNDA, Defendants represented that Acadia had an agreement with the FDA. To the extent that Defendants represented that the agreement contained terms that are inconsistent with the FDA's basis for ultimately denying approval . . . a plausible inference may be drawn at the pleading stage that Defendants misrepresented the existence or terms of the agreement . . .
>
>            \* \* \*
>
> The assertions that the FDA prospectively agreed on the "plan" for Phase III (i.e. the Harmony Study), that Acadia subsequently "executed that plan," and that the FDA was "on board" with the concept of "approving a drug to treat [DRP]" if Acadia "followed the plan" plausibly connote to a reasonable investor that the Harmony Study's design had been prospectively approved by the FDA and would not represent a further barrier to approval."

*Id*. at *8-9; *see also, e.g.*, *Skiadas v. Acer Therapeutics, Inc.*, No. 19-cv-6137, 2020 WL 3268495, at *9 (S.D.N.Y. June 16, 2020) (FDA's statements in CRL that Acer would need to conduct a well-designed clinical trial before it would consider approving EDSIVO "makes plausible the allegation that the FDA never agreed that no further clinical development was necessary before it would consider approving EDSIVO" and "satisfied [plaintiff's] burden to plead that Defendants' statements about what the FDA 'agreed to' were false or misleading."); *In re MannKind Sec. Actions*, 835 F. Supp. 2d 797, 809-10 (C.D. Cal. 2011) (statements that "described the FDA's

'vetting' of, 'blessing' of, 'approval' of, and 'agreement' with" design of Defendant's studies were plausibly false, "[b]ased on the FDA's subsequent order[] of further studies" which indicated "that no 'agreement' or 'blessing' had ever been secured.").

The same reasoning applies here. Given the FDA's rejection of the Oraxol NDA, either Defendants never had an agreement with the FDA with respect to approval of the Oraxol NDA, or they self-evidently misrepresented its terms, since the primary ORR endpoint of the Phase 3 Trial, which Defendants repeatedly stated the FDA had agreed it would accept as sufficient to win approval of Oraxol, was met and the FDA nonetheless denied the NDA on other grounds. In either event, as in *Acadia*, *Skiadas*, and *MannKind*, the Amended Complaint here alleges actionable misstatements with respect to this issue.

## B. The Magistrate Judge Erred by Determining the Alleged Omissions Were Not Actionable

### 1. The R&R Erroneously Concluded that Plaintiff Cannot Show Loss Causation

"To plead loss causation, plaintiffs must allege that the subject of the fraudulent statement or omission was the cause of the actual loss suffered." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232 (2d Cir. 2014). "They may do so *either* by alleging (a) 'the existence of cause-in-fact on the ground that the market reacted negatively to a corrective disclosure of the fraud;' or (b) 'that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement.'" *Id*. at 232-33 (quoting *In re Omnicom Grp., Inc. Sec. Litlg.*, 597 F.3d 501, 511, 513 (2d Cir. 2010)). "[T]he pleading rules for loss causation were 'not meant to impose a great burden upon a plaintiff,'" and thus "plaintiffs need only plead 'a short and plain statement,' pursuant to Fed. R. Civ. P. 8(a)(2), that provides defendants with 'some indication of the loss and the causal connection that the plaintiff has in mind.'" *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 202 (S.D.N.Y. 2010) (quoting *Dura Pharms., Inc. v.*

*Broudo*, 544 U.S. 336, 346-47 (2005)).  "[L]oss causation is also "a fact-based inquiry," *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 174 (2d Cir. 2005), that "[g]enerally . . . 'is a matter of proof at trial and not to be decided on a . . . motion to dismiss.'" *Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d Cir. 2003).

Remarkably, although Defendants and their sophisticated counsel never argued that the Amended Complaint failed to adequately allege loss causation in any respect, the R&R concluded that "Plaintiff . . . cannot show 'loss causation' as to . . . two alleged omissions" – specifically, Defendants' failures to disclose that Athenex's use of the §505(b)(2) pathway and changes in its CMC practices during the Phase 3 Trial jeopardized approval of the Oraxol NDA.  R&R at 20. This conclusion is predicated on numerous factual and legal errors.

As an initial matter, the R&R erroneously asserts that "**the CRL explaining why the FDA rejected the NDA for Oraxol** did not mention either [the §505(b)(2) pathway or changes in Athenex's CMC practices] as a basis for its decision."  *Id.*  However, the CRL is not publicly available.  The FDA is barred from publicly releasing a CRL for an NDA that has not been approved, denied, or withdrawn.  21 C.F.R. §§20.61, 314.430(d)(1).  Thus, all that is known regarding the contents of the CRL Athenex received with respect to the Oraxol NDA is what Defendants have chosen to disclose.  While Athenex's March 1, 2021 press release announcing receipt of the CRL disclosed certain issues cited by the FDA in refusing to approve the Oraxol NDA, specifically, the safety risk associated with an increase in neutropenia-related sequelae and bias in the BICR process (*see* AC ¶¶75-76), in remarks during a conference call with securities analysts held the same day, Defendant Kwan characterized these issues as the FDA's "main concerns," thereby conceding that the FDA had other concerns that were not disclosed.  ECF No. 64-3 at 5.  Indeed, a 2015 study published by FDA reviewers found that press releases from

10

commercial sponsors regarding CRLs they had received from the FDA omitted most of the statements in the letters. *See* P. Lurie, et al., *Comparison of content of FDA letters not approving applications for new drugs and associated public announcements from sponsors: cross sectional study*, 350 THE BMJ h2758 (June 10, 2015) (available at https://www.bmj.com/content/350/bmj.h2758).

In apparent recognition that loss causation does not present a high pleading hurdle, Defendants did not move to dismiss the Amended Complaint on that ground.[6] Nonetheless, the R&R erroneously reasons that the Complaint failed to plead loss causation regarding Defendants' failure to disclose the risks relating to: (i) Athenex's use of the "abbreviated" pathway for approval under Section 505(b)(2) of the Food Drug and Cosmetic Act; and (ii) changes in its CMC practices during the Phase 3 Trial. R&R at 20. Specifically, the R&R reasons that "the CRL explaining why the FDA rejected the NDA for Oraxol did not mention either of these two subjects as a basis for its decision." *Id.*

Here, Plaintiff alleges that Defendants' statements were materially false and misleading because they failed to disclose four significant risks to gaining FDA approval of the Oraxol NDA – use of the §505(b)(2) pathway, significant changes to CMC, the potential for bias in the BCR, and the fact that the Phase 3 Trial was conducted entirely in Latin America. AC ¶¶43-61. The CRL identifies two of these issues (potential for bias in the BCR, and the need for Athenex to conduct a new adequate and well-conducted clinical trial in a patient population with metastatic

---

[6] The question of whether Fed. R. Civ. P. 9(b) applies to loss causation allegations has not yet been definitively addressed by the Second Circuit. *See Wilamowsky v. Take-Two Interactive Software, Inc.*, 818 F. Supp. 2d 744, 753 n.7 (S.D.N.Y. 2011) (collecting cases). "Under either standard, however, the securities fraud plaintiff's burden is not a heavy one. She must only 'provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind.'" *In re Teva Sec. Litig.*, No. 3:17-CV-00558, 2023 WL 3186407, at *21 (D. Conn. May 1, 2023) (quoting *Dura*, 544 U.S. at 337).

breast cancer representative of the population in the U.S.) as concerns in rejecting the NDA. AC ¶75. Given that allegations of loss causation are subject to a notice pleading standard, the detailed allegations based on the accounts of CWs 2 and 3 that the §505(b)(2) pathway and the significant changes to CMC controls were also significant risks to the Oraxol NDA, combined with Defendant Kwan's admission that the CRL identified **other issues** with the Oraxol NDA beyond those that were disclosed by the Company, are sufficient to give rise to an inference at the pleading stage that these issues were among the "concerns" that led the FDA to reject the Oraxol NDA. Indeed, to hold otherwise would incentivize NDA sponsors to conceal the FDA's reasons for rejecting an NDA in order to minimize their liability for violating the federal securities laws. *See Okla. Police Pension Fund & Ret. Sys. v. Teligent, Inc.*, No. 19 Civ. 3354, 2020 WL 3268531, at *19 (S.D.N.Y. Jun. 17, 2020) (Holding that loss causation was adequately alleged notwithstanding that the company's receipt of letters from the FDA about compliance failures had never been disclosed, reasoning that "[f]rom a policy perspective" a company's concealment of the letters should not "shield [it] from liability," and noting that "Defendants point[ed] to no controlling case law that suggests that a defendant's refusing to disclose a material fact can defeat an allegation of loss causation.").[7]

   2. *The Factual Allegations Supporting the Alleged Omissions Are Not "Fatally Vague"*

In recommending that the action be dismissed, the R&R concludes that "the factual allegations" relating to Defendants' alleged failure to disclose the risks to the NDA were "fatally

---

[7] The authority cited by the R&R in support of its finding on loss causation is not to the contrary. Unlike in this case, in *Rice v. Intercept Pharms., Inc.*, No. 21-cv-0036, 2022 WL 837114 (S.D.N.Y. Mar. 21, 2022), the complaint did not allege any facts to support a plausible inference that undisclosed safety concerns relating to a drug that had already been approved to treat one patient population had anything to do with the FDA's decision to deny an NDA with respect to use of the drug to treat a separate condition, something plaintiffs' counsel had conceded at oral argument. *Id*. at *23.

vague" and that "plaintiff stops short of alleging any ***facts*** that show that any individual defendant knew of these concerns." R&R at 21 (emphasis in original). In this regard, the R&R focuses exclusively on the Amended Complaint's allegations based on the accounts of three Confidential Witnesses ("CWs") and dismisses them wholesale, concluding that the CWs' information was insufficiently specific and, with respect to CW2, stale based on her departure from Athenex in the fall of 2019. *Id*. at 21-24. In fact, however, the CW allegations are highly specific and demonstrate that key information regarding the risk that the FDA would not approve Oraxol based on the Phase 3 Trial was widely discussed and provided to key leadership within Athenex – including to Defendant Kwan himself.

CW2 was a Senior Regulatory Staffer at Athenex who met and/or communicated on a daily basis with Athenex's Senior Vice President for Regulatory Affairs, E. Douglas Kramer ("Kramer"), who was the executive responsible for the Company's regulatory strategy. AC ¶¶45-46. CW2 "worked on the Briefing Book submitted to the FDA in anticipation of the Company's Advisory Committee Meeting with respect to the Oraxol NDA" (*id.*, ¶46),[8] making CW2 well-placed to report on key developments related to the pivotal Phase 3 Trial. *See Freudenberg*, 712 F. Supp. 2d at 196 ("Information from confidential witnesses can be relied upon 'provided the CWs are described [] with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.'"). As a result, CW2 was able to provide highly specific and detailed information regarding the reasons the Oraxol NDA was at risk of not being approved and the ways in which the Individual Defendants had access to information relating to and became aware of this risk.

---

[8]   The Briefing Book contained detailed information about Oraxol and Athenex's Plan to obtain FDA approval. *Id.*, ¶46 n.10.

CW2 explained that Athenex's reliance on the §505(b)(2) pathway was problematic given that one of Oraxol's ingredients, encequidar, had not been previously approved by the FDA. AC ¶45. For this reason, CW2 personally told Kramer, who was responsible for the Company's regulatory strategy, "that Athenex should plan for the likely contingency that the FDA would require another clinical trial be conducted before granting approval for Oraxol." *Id.*, ¶46. This aspect of CW2's account is supported by a study of 226 §505(b)(2) NDAs approved in the five-year period from 2012 to 2016 which found that FDA classification types 1 and 2 (new molecular entities and new active ingredients, respectively) were rare because such products would typically be submitted as §505(b)(1) NDAs. *Id.*

Further, CW2 stated that Athenex's reliance on the §505(b)(2) pathway was flawed because the Company had not established that the prior paclitaxel clinical data that Athenex was relying upon in using the §505(b)(2) pathway was comparable to the data generated in Oraxol's Phase 3 Trial. *Id.*, ¶47. According to CW2, these comparability issues were considered "so grave" that beginning in 2019 and throughout CW2's tenure at Athenex, they, and their potentially fatal impact on Athenex's efforts to obtain FDA approval of Oraxol, were a primary topic of discussion at monthly "Project Team" meetings of Athenex's Oncology Innovation Platform segment[9] that CW2 attended along with Kramer, Michael Smolinski, Athenex's Vice President of Preclinical Operations who was CW2's supervisor, the Company's outside regulatory consultants, and other executives. *Id.*, ¶48. CW2 reported that by mid-2019 these issues were escalated to Athenex's Executive Committee (which was comprised of the Company's U.S.-based senior leadership including Defendant Kwan) via "a series of PowerPoint presentations" that were prepared by CW2

---

[9] Athenex's Oncology Innovation Platform segment was responsible for research and development of its proprietary drugs and included its regulatory affairs division.

and the Company's outside consultants, which "outlin[ed] the serious risk to obtaining regulatory approval [for Oraxol] due to" issues related to the §505(b)(2) pathway "and their assessment that the FDA was unlikely to approve Oraxol based on the Company's existing data." *Id.*, ¶49. Finally, CW2 also reported that these issues were "raised at a Global Team meeting attended by executives from all three of the Company's segments and members of the Executive Committee that occurred in Buffalo, New York in October 2019." *Id.*, ¶50.

Likewise, CW2 was also personally aware of "major changes" made to the Chemistry, Manufacturing and Controls ("CMC") implemented by Athenex in the Phrase 3 Trial. These changes threatened Athenex's ability to rely on earlier data; if the CMC were not consistent, Athenex would need "to conduct a series of tests (also referred to as 'bridging studies'), to ensure that the adopted changes remain in compliance with regulatory requirements." *Id.*, ¶52. CW2 was specifically aware of the movement of manufacturing from China to the United States; changes to the scale of production; and changes to the manufacturing processes. *Id.*, ¶¶51-53. Importantly, CW2's concerns with respect to CMC changes were corroborated by CW3. *Id.*, ¶54.[10] CW2 personally raised concerns regarding the CMC issues to Kramer "on multiple occasions," as well as to Athenex's Associate Director of Regulatory Affairs and the Company's outside consultants.

---

[10] Although the R&R dismisses the account of CW3 because this individual's job title and dates of employment were not alleged, the Amended Complaint alleges that CW3's role included reviewing proposed CMC literature that was to be included in Athenex's submissions to the FDA seeking approval for Oraxol. *Id.*, ¶54. As explained in the Memorandum in Opposition to the Motion to Dismiss (ECF No. 67 at 16 n.12), the absence of CW3's dates of employment is of no moment because Defendants admit that Athenex began to prepare the NDA submission package *after* the Company announced the Phase 3 Trial results. ECF No. 62 at 7. Therefore, the fact that CW3 worked on that submission sufficiently demonstrates that CW3 possessed relevant and timely information and, in any event, Plaintiff can replead, if necessary, to include CW3's employment information.

*Id.*, ¶53. In addition, CW2 stated that the CMC issues were also addressed in the Project and Global Team Meetings and featured in the PowerPoint presentations discussed above. *Id.*

Finally, CW2 also reported that "the risk that the FDA would recommend that Athenex conduct a new clinical trial of patients representative of the population of the U.S." (as opposed to Latin America, where the Phase 3 Trial took place) "was something that had been widely discussed at Athenex, including at Project Team Meetings." *Id.*, ¶¶55-56.

In addition to mischaracterizing the detailed information provided by CW2 as "vague," the R&R also incorrectly dismissed this information based on CW2's departure from Athenex in the fall of 2019. *See* R&R at 22. But the NDA's success was predicated on the pivotal Phase 3 Trial that was completed by July 25, 2019, which was during CW2's tenure with the Company. *See* AC ¶¶3, 45. Moreover, Athenex's flawed reliance on the §505(b)(2) pathway, which was widely known and discussed within the Company, including in meetings attended by Defendant Kwan, did not change after CW2's departure. Under these circumstances, the timing of CW2's departure is not grounds to dismiss the information CW2 provided (and which, in one instance, another CW corroborated).

The R&R also improperly dismissed the information provided by CW1. CW1, a former Clinical Research Associate who worked exclusively on the Phase 3 Trial, reported that "conversations pertaining to trial protocol discrepancies (*e.g.*, the size of tumors and whether a patient qualified to remain in the Phase 3 Trial) occurred between doctors at the trial sites, who were unblinded to the data, and the BICR firm," which undermined Defendants' assurances that the BICR had been "completely blinded." AC ¶¶61, 69. In dismissing these allegations, the R&R ignored the fact that after the CRL was issued, Defendants conceded that conversations between clinicians and the BICR had occurred while attempting to minimize their significance. *See* ECF

No. 64-3 at 13 (acknowledging basis of FDA's concerns but claiming it only impacted "[two] patients.").

In sum, viewed holistically and together with other allegations in the Amended Complaint, the CW accounts are anything but "vague" and cannot be fairly characterized as mere "subjective assessments" of these individuals. R&R at 21, 30. The R&R reached these erroneous conclusions by improperly viewing each of the CW's accounts in isolation and ignoring the fact that the accounts corroborate each other in multiple respects, and that they are supported by other facts alleged in the Amended Complaint and/or conceded by Defendants.

### 3. *Defendants' Half-Truths and Omissions Were Misleading*

The facts alleged in the Amended Complaint, including the CW allegations, when contrasted with Defendants' public-facing statements, plainly show that those statements were misleading. While Defendants were aware that there were serious issues that presented substantial risks to FDA approval of the Oraxol NDA – including issues related to the §505(b)(2) pathway under which Athenex was proceeding, the comparability of earlier studies to the Phase 3 Trial, major changes to the CMC, the location of the Phase 3 Trial in Latin America, and the independence of the "blinded" review – Defendants proceeded to make statements touting the Phase 3 Trial results that were gravely misleading half-truths that omitted undisclosed risks, that included the following:

- "[The] Phase III study successfully met its primary endpoint, showing a statistically significant and clinically meaningful improvement versus IV paclitaxel." AC ¶66 [Defendant Lau];

- The BICR was "completely blinded." *Id.*, ¶69 [Defendant Kwan];

- "[A]ll the CMC efforts are in parallel with the clinical studies." *Id.*, ¶70 [Defendant Lau];

- "We are excited by the positive results in the Phase III pivotal study, demonstrating improved ORR for Oral Paclitaxel compared to IV paclitaxel across a full spectrum of analyses and lower incidence of neuropathy in the Oral Paclitaxel group." *Id.*, ¶93 [Defendant Kwan];

- "[T]he findings from this Phase III study showing statistically significant improvement in ORR as monotherapy and longer duration of response over IV paclitaxel." *Id.*, ¶94 [Defendant Lau];

- "[O]ur Phase III study successfully met its primary endpoint, showing statistically significant and clinically meaningful improvement versus IV paclitaxel." *Id.*, ¶95 [Defendant Lau];

- "This study met its primary endpoint showing statistically significant improvement in overall response rate compared to IV paclitaxel. There were also strong trends in progression-free survival and overall survival of oral paclitaxel with duration of response greater than 150 days versus IV paclitaxel. Neuropathy was much less frequent with oral paclitaxel." *Id.*, ¶108 [Defendant Lau];

- "We are moving ahead confidently towards our first NDA submission for our oral discovery platform based on the strong data we previously reported for our lead candidate, oral paclitaxel and encequidar." *Id.*, ¶109 [Defendant Kwan];

- "The planned NDA submission for oral paclitaxel is supported by a strong clinical data package . . ." *Id.*, ¶119 [Defendant Lau]; and

- "We have shown in our Phase III study a superior response rate and also survival benefit as well as lower neuropathy. Our team is excited about the clinical results, and are further driven by the encouraging feedback from most of the U.S. clinical experts that we spoke to, who have reviewed the clinical data." *Id.*, ¶132 [Defendant Cook].[11]

As explained herein and in Plaintiff's Opposition to the Motion to Dismiss, these statements about the strength of the Phase 3 Trial results and the NDA's chances of approval were materially misleading in light of the significant flaws in the Trial that, as explained below, were known to, or recklessly disregarded by Defendants. *See* ECF No. 66 at 12-13, 17.

---

[11] Defendants made substantially similar statements on numerous occasions throughout the Class Period as detailed in the Amended Complaint. *See id.*, ¶¶74, 91-157.

Although the R&R identifies just seven statements as "the type of optimistic, broad statements of projections, goals, or expectations that would constitute puffery or opinion under Second Circuit law" (R&R at 26-27), it goes on to broadly conclude that "defendants' opinions regarding Oraxol's trial results and the prospects for FDA approval are not actionable" (*id.* at 27), suggesting that its finding applied to a far broader set of statements than those it highlighted, including those statements identified at pp. 16-22 of Defendants' brief in support of its motion to dismiss. To the extent this was the R&R's conclusion, it is in error.

As an initial matter, Defendants' statements that Oraxol "met the primary efficacy endpoint showing a statistically significant and clinically meaningful improvement versus IV paclitaxel"; that "there were also strong trends in progression-free survival and overall survival of oral paclitaxel" and "much less frequent" neuropathy with Oraxol; that the "NDA submission for oral paclitaxel [wa]s supported by a strong clinical data package"; describing the BICR process as both "rigorous" and "completely blinded" and the CMC package as "really strong"; and stating that the NDA was "on track" and Athenex was "moving ahead confidently" with its submission, were not puffery. All of these statements were made in the context of describing ***scientific results*** and their fitness for supporting an NDA, not in the context of touting subjective qualities of a product that no investor would consider material. Numerous courts have found essentially identical statements uttered in the same context to be actionable. *See, e.g.*, *Acadia*, 2022 WL 4491093, at *10-11 (statements representing that data and results of studies were "meaningful," "positive," "pivotal," "robust," and "strong" were actionable); *Rihn v. Acadia Pharms. Inc.*, No. 15cv00575, 2016 WL 5076147, at *5 (S.D. Cal. Sept. 19, 2016) ("Defendants' assurances that the NDA remained 'on track' for submission . . . were materially misleading."); *In re Nuvelo, Inc. Sec. Litig.*, 668 F. Supp. 2d 1217, 1230–31 (N.D. Cal. 2009) ("[D]efendants' optimistic statements about [drug's] path to

regulatory approval" actionable "because they concealed or downplayed known present risks related to regulatory approval."). Indeed, it is difficult to imagine more material topics to investors in Athenex stock than the results of the Phase 3 Trial, whether the data demonstrated a "clinically relevant" effect from treatment with Oraxol, the NDA, and the tenor of Athenex's communications with the FDA with respect to these matters.

Nor are the challenged statements non-actionable statements of opinion. Under *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 189, 193 (2015), a statement of opinion or belief can be "misleading by omissions" when the statement "omit[s] material facts about the [defendants'] inquiry into or knowledge concerning a statement of opinion" and if those facts "conflict with what a reasonable investor would take from the statement itself." Applying this standard, Defendants' statements concerning Oraxol's trial results and the prospects for FDA approval are actionable based on Defendants' failure to disclose known risks to the NDA's approval, which must be viewed in the context of Defendants' false statements about Athenex's "agreement" with the FDA detailed above. *Rihn,* 2016 WL 5076147, at *5 ("[W]hether an omission makes an expression of opinion misleading always depends on context."); *accord Omnicare*, 575 U.S. at 194. These statements, even if construed as "opinions," were clearly intended to, and did, reinforce for investors the sufficiency of the Phase 3 Trial and the likelihood of FDA approval. *See MannKind*, 835 F. Supp. 2d at 811 ("[N]atural effect" of "statements concerning 'approval' and 'blessing' by the FDA" is "the impression for investors that . . . 'it was in the bag.'").

The R&R relied in large part on *Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016), to dismiss the Individual Defendants' alleged omissions and half-truth as nonactionable opinion statements. However, in *Tongue,* the court held that that the defendants' interpretation of the study data "did

not conflict with the information available to them at the time" the statements were made. *Id*. at 213-14. Here, in contrast, the opposite circumstances are present. There are ample facts alleged in the Amended Complaint demonstrating the Individual Defendants' awareness of the significant, undisclosed risks to approval of the Oraxol NDA.

### C. The Amended Complaint Adequately Alleges Scienter

Scienter is adequately alleged if, after a holistic analysis of all allegations, "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007). A court must consider "whether *all* of the facts alleged, taken collectively" give rise to such an inference, and "not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 323. A defendant's conscious misbehavior or reckless conduct will suffice for purposes of alleging scienter and can be established with circumstantial evidence that the defendant "knew facts or had access to information suggesting that their public statements were not accurate," or "failed to review or check information that they had a duty to monitor." *Novak v. Kasaks*, 216 F.3d 300, 308, 311 (2d Cir. 2000). A plaintiff's inference that a defendant acted with scienter, moreover, "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Tellabs*, 551 U.S. at 324. Rather, it need only be "at least as strong as any opposing inference." *Id*. at 326. Thus, "at the motion to dismiss stage, a tie on scienter goes to the plaintiff." *City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012).

While the R&R purported to conduct the required holistic analysis of all allegations of scienter in the Amended Complaint, it failed to consider important allegations supporting a strong inference of scienter, including the Individual Defendants' misstatements with respect to an agreement with the FDA. *See*, §§III.A, III.B.4, *supra*. As discussed above, Individual Defendants

Lau and Kwan both stated that Athenex had an agreement with the FDA to approve Oraxol if the primary endpoint of the Phase 3 Trial was met – but, as ultimately became known, that agreement either never existed or, if it did exist, its terms were inconsistent with Defendants' statements. *See* discussion *supra* at §III.A; *see also Acadia*, 2022 WL 4491093, at *8-9. In either case, such misrepresentations support a strong inference of scienter. *See Skiadas*, 2020 WL 3268495, at *10 ("Defendants' statements concerning . . . an 'agreement' themselves are probative evidence of "a strong inference of scienter.") (*quoting MannKind*, 835 F. Supp. 2d at 811-12).

In addition to ignoring important allegations supporting a finding of scienter, the R&R's conclusion that scienter was not adequately alleged rests on a series of flawed predicates. First, the R&R's conclusion that "the allegations of the confidential witnesses do not 'connect the dots' between the alleged flaws underlying the NDA and any knowledge or recklessness on defendants' part" (R&R at 30) ignores the allegations of the Amended Complaint which, as noted above, identify meetings attended by, and materials prepared for, the Individual Defendants that discuss these alleged flaws. *See*, *supra*, §III.B.2.[12]

Second, the R&R improperly concludes that the secondary offering cannot support scienter because "general motives common to most corporate officers do not constitute 'motive' for the purposes of establishing scienter." R&R at 28 (*quoting Villare,* 2021 WL 4311749, at *21). However, the R&R ignores that a second public offering was necessary to continue to fund

---

[12] Thus, this case is distinguishable from the decisions cited in the R&R. In *Villare v. Abiomed, Inc.*, No. 19 Civ. 7319, 2021 WL 4311749, at *22-23 (S.D.N.Y. Sept. 21, 2021), the CWs expressed a variety of disjointed (and at times, contradictory) concerns related to the company's aggressive and/or unrealistic sales goals, its use of clinical data, and the reason(s) for stalling sales, none of which the CWs could clearly demonstrate were brought to the attention of the two individual defendants. *See id.* at *7-*9. Similarly, in *In re Adient plc Sec. Litig.*, No. 18-CV-9116, 2020 WL 1644018, at *27 (S.D.N.Y. Apr. 2, 2020), *aff'd sub nom. Bristol Cnty. Ret. Sys. v. Adient PLC*, 2022 WL 2824260 (2d Cir. July 20, 2022), unlike in this case, the complaint failed to allege that the relevant operational concerns came to the defendants' attention.

Athenex's operations. In this regard, the Amended Complaint alleges that Athenex had "r[u]n out of money" by June 2020, which caused it to enter into a senior credit agreement with multiple lenders to borrow up to $225 million – only $150 million of which was available to Athenex without contingencies. *See* AC ¶88 & n.13. Before the end of that month (June 2020), Athenex had borrowed $100 million from the fund, and it borrowed the other $50 million soon thereafter. *See id.* At that point, Athenex was out of money, and the second SPO was necessary for it to continue operations. Under similar circumstances, courts have held that allegations of a public offering support an inference of scienter. *See*, *e.g.*, *Skiadas*, 2020 WL 3268495, at *11 ("The inference of scienter is also bolstered by the fact that Defendants admitted in their SEC filings that they needed to raise funds . . . to remain viable."); *Medina v. Clovis Oncology, Inc.*, 215 F. Supp. 3d 1094, 1128 (D. Colo. 2017) (holding that allegation that company was "'heavily dependent' upon investor capital in order to fund its operating expenses" was "a factor from which scienter may be inferred because, if true . . . Defendants had a strong incentive to mislead potential investors about the efficacy and safety of rociletnib in order to attract investors' capital.").

Third, the R&R cites the absence of any stock sales by the Individual Defendants, purchases of Athenex stock by three of the Individual Defendants, and Athenex's devotion of substantial resources towards preparing for the launch of Oraxol in anticipation of FDA approval as facts suggesting the absence of fraudulent intent. R&R at 31-32. However, "there is no *per se* rule that stock purchases negate any inference of scienter." *In re Fannie Mae 2008 Sec. Litig.*, No. 08 Civ. 7831, 2011 WL 13267340, at *3 (S.D.N.Y. Apr. 11, 2011). Further, the purchase of Athenex's stock alone "cannot counteract the circumstantial evidence of fraudulent intent described above; such a rule would create incentive for corporate officers to insulate themselves from liability by purchasing stock merely to negate an inference of fraud." *In re MF Glob.*

*Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 320 (S.D.N.Y. 2013). "Thus, courts have regularly found scienter even where insiders purchased shares during the class period." *In re Advance Auto Parts, Inc. Sec. Litig.*, No. 18-212, 2020 WL 599543, at *8 (D. Del. Feb. 7, 2020) (collecting cases).

Nor does Athenex's devotion of resources to preparing for Oraxol's launch undermine the other substantial evidence giving rise to a strong inference of scienter. These allegations support the inference that Defendants recklessly gambled that the FDA would ultimately approve Oraxol. As Judge Posner explained:

> The fact that a gamble – concealing bad news in the hope that it will be overtaken by good news – fails is not inconsistent with its having been a considered, though because of the risk a reckless, gamble. It is like embezzling in the hope that winning at the track will enable the embezzled funds to be replaced before they are discovered to be missing.

*Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008).

Finally, all of the above must be considered in the context of the core operations doctrine. The R&R stated that the core operations doctrine cannot establish scienter on its own (R&R at 31), but Plaintiff is not relying solely on the core operations doctrine to establish the requisite strong inference of scienter. Moreover, the prerequisites of the core operations doctrine are easily satisfied here: approval of Oraxol, Athenex's "lead drug candidate," was critical to Athenex's future, and the Individual Defendants repeatedly stated that they were directly involved in Oraxol's NDA. *See* ECF No. 66 at 22-23; *see also, e.g.*, *In re Avon Sec. Litig.*, No. 19 Civ. 01420, 2019 WL 6115349, at *20 (S.D.N.Y. Nov. 18, 2019) ("[I]t would be absurd to suggest that Avon's senior management was unaware of a widespread delinquency problem in the company's single largest market.").

### D.    Leave to Replead Should Be Granted

The R&R recommends that plaintiff's request to amend be denied.  *See* R&R at 34.  But where, as here, a complaint is dismissed under Rule 9(b), it is "almost always" dismissed with leave to amend.  *Luce v. Edelstein*, 802 F.2d 49, 56-57 (2d Cir. 1986) (holding that the district court abused its discretion in dismissing the complaint where "[i]n opposing defendants' motion to dismiss, plaintiffs specifically requested leave to amend should dismissal be granted").  Accordingly, if the Court should grant Defendants' motion in whole or in part, Plaintiff respectfully requests leave to amend the complaint pursuant to Rule 15(a) via the filing of a formal motion for leave to amend within 30 days, consistent with the Court's ruling and Local Rule 15.  *See, e.g.*, *Kelly for Moudy v. Snap-on Inc.*, No. 21-CV-729-LJV, 2022 WL 2758308, at *6 (W.D.N.Y. July 14, 2022) (Vilardo, J.) (where plaintiff had not filed proposed amended complaint in compliance with Local Rule 15, nonetheless providing plaintiff opportunity to file amended complaint addressing the deficiencies noted by the Court within 30 days of the Court's order); *MacSwan v. Merck & Co.*, 602 F. Supp. 3d 466, 482 (W.D.N.Y. 2022) (providing plaintiff with 30 days to file a motion for leave to amend consistent with the Local Rules following dismissal); *see also Porat v. Lincoln Towers Cmty. Ass'n*, 464 F.3d 274, 276 (2d Cir. 2006) ("[T]his circuit strongly favors liberal grant of an opportunity to replead after dismissal of a complaint under Rule 12(b)(6).") (cited in *Kelly for Moudy*, 2022 WL 2758308, at *6).

### IV.    CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Report and Recommendation be rejected and Defendants' motion to dismiss be denied.

DATED: October 13, 2023                **SCOTT+SCOTT ATTORNEYS AT LAW LLP**

  */s/ Deborah Clark-Weintraub*
Deborah Clark-Weintraub
Jeffrey P. Jacobson

The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Tel.: (212) 223-6444
Fax: (212) 223-6334
dweintraub@scott-scott.com
jjacobson@scott-scott.com

*Lead Counsel for Plaintiff*

**LABATON SUCHAROW LLP**

 */s/ Michael P. Canty*
Michael P. Canty
140 Broadway
New York, NY 10005
Tel.: (212) 907-0700
Fax: (212) 818-0477
mcanty@labaton.com

*Additional Counsel*