UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE ATHENEX, INC. SECURITIES LITIGATION<br><br>This Document Relates to:<br><br>    All Actions. | No.: 21-cv-00337 (LJV-HKS)<br><br>CONSOLIDATED CLASS ACTION |

**DEFENDANTS' RESPONSE TO PLAINTIFF'S**
**<u>OBJECTIONS TO REPORT AND RECOMMENDATION</u>**

i

**TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION .................................................................................................................1

II.    FACTUAL AND PROCEDURAL BACKGROUND.......................................................3

III.   LEGAL STANDARDS ........................................................................................................8

IV.    ARGUMENT........................................................................................................................9

      A.    R&R Correctly Found Plaintiff Failed to Plead a False or Misleading
           Statement........................................................................................................................9

           1.    Each of Plaintiff's Theories of Falsity Fails for Lack of Factual
                Support..............................................................................................................9

           2.    None of the Challenged Statements Was False or Misleading..................15

      B.    The R&R Correctly Found Plaintiff Failed to Plead a Strong Inference of
           Scienter. ........................................................................................................................22

V.     CONCLUSION...................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abely v. Aeterna Zentaris, Inc.*,
2013 WL 2399869 (S.D.N.Y. May 29, 2013) ...........................................................................17

*Acito v. IMCERA Grp., Inc.*,
47 F.3d 47 (2d Cir. 1995) .........................................................................................................23

*Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*,
28 F.4th 343 (2d Cir. 2022) ......................................................................................................24

*Avon Pension Fund v. GlaxoSmithKline PLC*,
343 F. App'x 671 (2d Cir. 2009) ..............................................................................................23

*In re Axonyx Sec. Litig.*,
2009 WL 812244 (S.D.N.Y. Mar. 27, 2009) ...........................................................................25

*Campo v. Sears Holdings Corp.*,
371 F. App'x 212 (2d Cir. 2010) ..............................................................................................12

*Carr v. Zosano Pharma Corp.*,
2021 WL 3913509 (N.D. Cal. Sept. 1, 2021) ..........................................................................23

*City of Birmingham Relief & Ret. Sys. v. Acadia Pharms., Inc.*,
2022 WL 4491093 (S.D. Cal. Sept. 27, 2022) .........................................................................20

*Cozzarelli v. Inspire Pharms. Inc.*,
549 F.3d 618 (4th Cir. 2008) ...................................................................................................25

*ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009) .....................................................................................................22

*Glaser v. The9, Ltd.*,
772 F. Supp.2d 573 (S.D.N.Y. 2011) .................................................................................11, 24

*Gregory v. ProNAi Therapeutics Inc.*,
297 F. Supp. 3d 372 (S.D.N.Y. 2018) ................................................................................13, 24

*Hubbard v. Kelley*,
752 F. Supp. 2d 311 (W.D.N.Y. 2009) ......................................................................................8

*Immanuel Lake v. Zogenix, Inc.*,
2020 WL 3820424 (N.D. Cal. Jan. 27, 2020) ....................................................................14, 22

*Jackson v. Halyard Health, Inc.*,
2018 WL 1621539 (S.D.N.Y. Mar. 30, 2018) ..........................................................................24

*Jun Shi v. Ampio Pharms., Inc.*,
2020 WL 5092910 (C.D. Cal. June 19, 2020) ..........................................................................24

*Kleinman v. Elan Corp., plc*,
706 F.3d 145 (2d Cir. 2013)....................................................................................................16

*Long Miao v. Fanhua, Inc.*,
442 F. Supp. 3d 774 (S.D.N.Y. 2020)......................................................................................13

*In re Lululemon Sec. Litig.*,
14 F. Supp. 3d 553 (S.D.N.Y. 2014)........................................................................................12

*In re MannKind Sec. Actions*,
835 F. Supp. 2d 797 (C.D. Cal. 2011) .....................................................................................20

*McDonaugh v. Astrue*,
672 F. Supp. 2d 542 (S.D.N.Y. 2009).........................................................................................8

*Medina v. Clovis Oncology, Inc.*,
215 F. Supp. 3d 1094 (D. Colo. 2017)......................................................................................24

*In re MELA Sciences, Inc. Sec. Lit.*,
2012 WL 4466604 (S.D.N.Y. Sep. 19, 2012)......................................................................17, 23

*Okla. Police Pension Fund & Ret. Sys. v. Teligent, Inc.*,
2020 WL 3268531 (S.D.N.Y. Jun. 17, 2020) .....................................................................15, 18

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
575 U.S. 175 (2015)..........................................................................................................9, 17, 20

*Ravi v. Citigroup Glob. Mkts. Holdings, Inc.*,
2022 WL 92775 (S.D.N.Y. Jan. 10, 2022) .................................................................................8

*Rice v. Intercept Pharms., Inc.*,
2022 WL 837114 (S.D.N.Y. Mar. 21, 2022) ............................................................................15

*Ronconi v. Larkin*,
253 F.3d 423 (9th Cir. 2001) ...................................................................................................23

*Salvani v. InvestorsHub.com, Inc.*,
628 F. App'x 784 (2d Cir. 2015) ..............................................................................................15

*Schiro v. Cemex, S.A.B. de C.V.*,
396 F. Supp. 3d 283 (S.D.N.Y. 2019)..................................................................................11, 13

*Skiadas v. Acer Therapeutics, Inc.*,
  2020 WL 3268495 (S.D.N.Y. June 16, 2020) ...................................................................20, 24

*Slayton v. Am. Express Co.*,
  604 F.3d 758 (2d Cir. 2010)...........................................................................................17

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007).........................................................................................9, 22, 23

*Tongue v. Sanofi*,
  816 F.3d 199 (2d Cir. 2016)........................................................................................16, 17

*United States v. Gladden*,
  394 F. Supp. 3d 465 (S.D.N.Y. 2019)..............................................................................8

*Villare v. Abiomed, Inc.*,
  2021 WL 4311749 (S.D.N.Y. Sept. 21, 2021)...................................................................25

*In re Wachovia Equity Sec. Litig.*,
  753 F. Supp. 2d 326 (S.D.N.Y. 2011)..............................................................................12

*Wright v. Duncan*,
  31 F. Supp. 3d 378 (N.D.N.Y. 2011) ...............................................................................8

**Statutes**

15 U.S.C. §§ 78u-4(b)...........................................................................................................9

**Rules**

Fed. R. Civ. P. 72(b)(3).........................................................................................................8

Local Rule 72(c) ...............................................................................................................8, 9

**Other Authorities**

*Priority Review*, FDA (Jan. 4, 2018), https://www.fda.gov/patients/fast-track-
  breakthrough-therapy-accelerated-approval-priority-review/priority-review ...........................6

Individual Defendants Johnson Y.N. Lau, Rudolf Kwan, Timothy Cook, and Jeffrey Yordon ("Defendants")[1] submit this response to Plaintiff's Objection (Dkt. #75; "Obj.") to the Report and Recommendation of Magistrate Judge H. Kenneth Schroeder, Jr. dated Sept. 29, 2023 ("R&R"; Dkt. #74) recommending that Defendants' Motion to Dismiss (Dkt. #61; "MTD") be granted as to the Defendants with prejudice. Defendants incorporate herein their Mem. of Law in support of the MTD (Dkt. #62; "MTD Mem."); Request for Judicial Notice[2] (Dkt. #63; "RJN"), Greene Dec. and Exhibits 1-23 (Dkt. #64); and Reply (Dkt. #67), all of which demonstrate the fatal flaws in the Amended Complaint (Dkt. #56; "AC") and support the R&R's conclusion.[3]

## I. INTRODUCTION

As the Magistrate Judge correctly found, Plaintiff's claims here are classic "fraud by hindsight." R&R 33. For years, Defendants worked hard to bring to market Athenex's lead drug candidate, oral paclitaxel plus encequidar ("OPE")—a first-in-class oral chemotherapy agent that, if approved, would allow for oral delivery of a widely-used chemotherapy drug that is currently only available by intravenous ("IV") administration. Following promising Phase 1 and 2 clinical trials, Athenex conducted a Phase 3 clinical trial (the "Phase 3 Trial"), comparing OPE against IV paclitaxel in patients with metastatic breast cancer. As announced at the beginning of the class period, the Phase 3 Trial data looked very strong: the Trial met its primary endpoint, with OPE showing statistically significant improvement in overall tumor response rate ("ORR") as measured by a blinded independent central review committee ("BICR"), as well as trends of improvement on progression-free ("PFS") and overall survival ("OS"). And it did all this with what Defendants viewed as a superior safety profile, including fewer treatment-limiting neuropathic side effects

---

[1] This action is stayed as against Athenex, Inc. ("Athenex" or the "Company"). *See* Dkt. #70.
[2] Plaintiff does not oppose the RJN. *See* Pl's Opposition to MTD ("MTD Opp."; Dkt. #66), § V.
[3] Defined terms are the same as in MTD Mem. Internal quotation marks and citations are omitted.

than the IV control arm. In light of these results, Defendants were highly optimistic about OPE's chances of approval, even more so when the FDA granted the new drug application ("NDA") "priority review"—reserved for the few new drug candidates the FDA views as most promising.

But, as Defendants repeatedly warned investors, the regulatory review process is inherently unpredictable and the outcome uncertain; and ultimately, the FDA came to see the trial data differently than Defendants. In late February 2021, the FDA issued a Complete Response Letter ("CRL"), declining to approve the NDA in its current form, citing concerns about neutropenia-related safety risks and aspects of the primary endpoint analysis, and recommending Athenex conduct an additional large-scale clinical trial. On this news, the stock price dropped and plaintiffs immediately sued, accusing Athenex and the individual Defendants of making false and misleading positive statements about the Phase 3 Trial results and OPE's prospects when, Plaintiff speculates, they must have known that the NDA was not likely to be approved.

No facts support this baseless assertion—no facts suggest the Defendants did not actually believe the optimistic opinions they expressed about OPE's efficacy, safety, and prospects, had any motive to lie, or knew that approval was unlikely. Instead, Plaintiff's claims rest entirely on speculation and the vague and unsupported allegations of three anonymous former mid-level employees, none of whom claims any personal knowledge as to what any Defendant knew or believed when he made the challenged statements. As the R&R correctly found, this is insufficient as a matter of law to meet the Reform Act's stringent pleading standards, particularly in light of the many stronger inferences of good faith. The Magistrate Judge's 36-page R&R carefully laid out the record and relevant pleading standards, thoughtfully analyzed Plaintiff's claims, and correctly concluded they were insufficiently pleaded. Among other things, it found that the factual allegations on which Plaintiff relied to show falsity—and particularly the confidential witness

2

("CW") allegations—are "fatally vague" and fail to show that "any of the Defendants' statements were inaccurate at the time they were made or that any defendant believed those statements to be inaccurate when made." R&R 21, 23. The R&R also concluded that the challenged statements "regarding [OPE]s trial results and the prospects for FDA approval" were true and not misleading statements of opinion and/or "puffery," and therefore not actionable. R&R 24-27. And after a holistic analysis of all of Plaintiff's allegations, including motive and opportunity as well as circumstantial evidence, the R&R found that "the most cogent inference" is that the Defendants genuinely believed their optimistic statements about the clinical results and the drug's prospects and that "Plaintiff's attempt to leverage the fact that defendants turned out to be wrong into a securities claim is simply 'fraud by hindsight.'" R&R 33.

Faced with this strong and well-reasoned rejection of its claims, Plaintiff's Objection pivots, raising new arguments and distorting the record. As detailed below, none of Plaintiff's objections has merit. The R&R carefully analyzed the pleadings—holistically and in their constituent parts—and correctly concluded that Plaintiff's claims were insufficiently pleaded in multiple, independently dispositive respects. Nothing in Plaintiff's Objection compels a different result, and the Court should adopt the R&R, and dismiss the AC with prejudice.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

The factual background is detailed at length in Defendants' MTD, and in the "Background" section of the R&R, to which Plaintiff does not object. *See* R&R 1-16; MTD Mem. 3-10.

Athenex was a "clinical stage biopharmaceutical company working to develop and commercialize new cancer treatments." AC ¶ 22. For the several years leading up to and throughout the class period, Athenex's lead drug candidate was OPE—a proprietary combination of chemotherapy drug paclitaxel and a novel P-gp pump inhibitor molecule (encequidar), that, when taken together orally, allows the body to absorb paclitaxel through the digestive system

rather than traditional IV infusion. Dkt. #64-2, at 2; AC ¶ 28. OPE had—and still has—the potential to transform cancer care by freeing patients from the need for regular IV infusions, which can take the better part of a day, making work and normal life difficult, and simply are not available in parts of the world where patients cannot get to a clinic on a regular basis. Dkt. #64-4, at 5, 10; Dkt #64-5, at 8. Moreover, IV chemotherapy has a variety of common and undesirable side effects, including (i) neutropenia, which clinicians routinely monitor and treat, and (ii) neuropathy, which is harder to manage, typically does not go away when the patient stops the drug, and often causes patients to discontinue treatment. Dkt. #64-4, at 6-7. OPE represents a potentially revolutionary solution to some of these intractable problems with IV chemotherapy—allowing for easier oral administration and more even drug exposure, which Defendants hoped and expected, based on promising Phase 1 and 2 results, would result in an improved safety profile. *See* Dkt. #64-2, at 9.

Athenex designed its pivotal Phase 3 Trial around its intention to seek approval through the § 505(b)(2) pathway for new drugs, which allows the sponsor to rely on the FDA's prior findings of safety and efficacy for a previously-approved drug (here, paclitaxel). AC ¶ 43; Dkt. #64-2, at 31. Use of the § 505(b)(2) pathway dictated several aspects of the Phase 3 Trial: (1) to achieve proper "bridging" to previous paclitaxel studies, the control arm had to use the FDA-approved paclitaxel label of every-3-weeks IV infusions (rather than the off-label weekly standard of care in the U.S.) (*see* Dkt. #64-5, at 9); (2) as a result of the every-3-weeks IV control arm, it would be difficult to recruit patients in the U.S. and made more sense to conduct the study in Latin America where an every-3-weeks infusion schedule is more common; and (3) it was necessary to use ORR as assessed by a BICR using the RECIST Criteria—the gold standard for cancer studies—as the primary endpoint, and PFS and OS as secondary endpoints. *See* AC ¶ 37. Towards the end of 2017, Athenex consulted the FDA regarding the Phase 3 Trial design and in January

4

2018 it announced positive FDA feedback indicating "that if the study meets the primary endpoint with an acceptable Benefit/Risk profile, it could be adequate as a single comparative trial to support registration of [OPE] for metastatic breast cancer indication in the [U.S.]" AC ¶ 39; Dkt. #64-6.

That is precisely what Athenex did. On August 7, 2019, Athenex announced positive top-line results: the Phase 3 Trial met its primary endpoint, demonstrating strong, statistically significant improvement in ORR for OPE compared to IV paclitaxel in the more rigorous intent-to-treat ("ITT") population; trends of improvement for the secondary survival endpoints; and a far higher proportion of long-duration responders in the OPE arm. AC ¶ 60; Dkt. #64-8, at 04. Moreover, Athenex interpreted the data as showing an improved safety profile: OPE had a lower incidence of neuropathy compared to IV paclitaxel—which would "allow some patients to stay on treatment longer and potentially improve outcomes"—as well as lower incidences of alopecia, arthralgia, and myalgia. Dkt. #64-7, at 6. There were slightly more serious neutropenia and gastrointestinal events in the OPE arm, but Athenex viewed these as well-known side effects of chemotherapy generally that clinicians could manage. *Id.* at 6, 12. As Defendants explained, they believed these results gave OPE an excellent chance at approval: the Trial had met the primary endpoint the FDA indicated could be sufficient if it was statistically significant using the ITT population (it was) and the risk/benefit analysis looked favorable (it did). AC ¶ 68.

Nonetheless, Athenex explicitly and repeatedly warned that it was impossible to know if the FDA would approve the NDA for OPE, regardless of the clinical results:

> Notwithstanding the submission of relevant data and information, the FDA may ultimately decide that the NDA does not satisfy its regulatory criteria for approval. Data obtained from clinical trials are not always conclusive, and the FDA may interpret data differently than the applicant. If the agency decides not to approve the NDA in its then present form, the FDA will issue a [CRL] that describes all of the specific deficiencies in the NDA identified by the FDA. The deficiencies . . . may be minor . . . or major, for example, requiring additional clinical trials.

> ***The regulatory approval processes of the FDA . . . are lengthy, time consuming and inherently unpredictable, and if we are ultimately unable to obtain regulatory approval for our drug candidates, our business will be substantially harmed.*** . . . Our drug candidates could fail to receive regulatory approval from the FDA . . . for many reasons, including: . . . disagreement with the design or implementation of our clinical trials; failure to demonstrate that a drug candidate is safe and effective . . . failure to demonstrate that [its] clinical and other benefits outweigh its safety risks; disagreement with our interpretation of [clinical data . . . [or] the insufficiency of data collected from clinical trials. . . to support the submission . . . .

R&R 9-11; Dkt. #64-2 (2019 10-K), at 32, 61-62.[4]

Over the next 12 months, Athenex worked hard to prepare the extensive NDA submission package, including interpreting the clinical data for OPE, comparing them to previous IV paclitaxel studies, and demonstrating the sufficiency of Athenex's "chemistry, manufacturing, and controls" ("CMC") practices for OPE. AC ¶ 70, 103, 111; Dkt. #64-5, at 10-11. This process also involved consultation with outside experts, and a meeting with the FDA in April 2020 "to discuss the clinical section of the [NDA]." AC ¶¶ 102, 110, 123, 126, 131, 134. Athenex submitted the NDA for OPE in the summer of 2020, and on September 1, 2020, it announced that the FDA had accepted the NDA for filing *with priority review*—expedited treatment the FDA reserves for the new drugs it believes are most likely to offer significant improvements over existing therapies.[5] The FDA set an expedited target action date of February 28, 2021, and Athenex and the FDA got to work, engaging in the high-intensity dialogue typical of NDA reviews. AC ¶¶ 151-52.

At the same time, Athenex continued moving full steam ahead with its extensive preparations to commercialize OPE immediately upon approval. AC ¶¶ 112, 133, 137; Dkt. #64-11, at 6-7. These preparations involved significant expense for a clinical-stage company, and Athenex conducted a secondary public offering in September 2020, largely to ensure that it had

---

[4] *See also id.* at 63-64; Dkt. 64-9 (2018 10-K), at 43, 63, 73-74 (same).

[5] AC ¶ 143; *Priority Review*, FDA (Jan. 4, 2018), https://www.fda.gov/patients/fast-track-breakthrough-therapy-accelerated-approval-priority-review/priority-review.

the "financial flexibility to continue advancing the development and commercialization of [its] lead drug candidates." AC ¶¶ 88, 137. Defendants believed it was worth it, in part because they "s[aw] [OPE] very much as the right compound at the right time":

> [A]s a result of the . . . pandemic, there has been increased interest and demand . . . for oral therapies options. Earlier this year, the [National Comprehensive Cancer Network] issued guidance . . . encourage[ing] switching patients from infusion-based therapies to oral oncolytics . . . . In a recent FDA news release, [the] Director of the FDA's Oncology Center of Excellence[] stated that the FDA was focused on providing options . . . that can reduce the need to leave home.

Dkt. #64-14, at 5; AC ¶¶ 141, 149 (similar). This context, combined with the strong Phase 3 clinical results and the FDA's grant of priority review, gave Defendants good reason for optimism.

Much to Defendants' surprise, the FDA ultimately saw the data differently. On March 1, 2021, the Company announced that the FDA had issued a CRL, indicating that it would not approve the NDA in its present form but encouraging Athenex to continue its development. The press release announced that the FDA (i) "indicated its concern of safety risk to patients in terms of an increase in neutropenia-related sequelae on the [OPE] arm"; (ii) "expressed concerns regarding the uncertainty over the results of the primary endpoint of [ORR] . . . stat[ing] that the BICR reconciliation and re-read process may have introduced unmeasured bias and influence on the BICR"; and (iii) "recommended that Athenex conduct a new adequate and well-conducted clinical trial in a patient population with metastatic breast cancer representative of the population in the U.S." AC ¶ 12, 75; Dkt. #64-1, at 12. The Defendants expressed surprise, disappointment, and frustration at this result, reiterating their belief that the clinical data showed strong efficacy and safety and the neutropenia side effects were manageable, and expressing hope that they could convince the FDA of this at a future meeting. Dkt. #64-3, at 9, 13. Athenex's stock price dropped following this announcement, and this lawsuit was filed just a few days later.

The AC asserts that Defendants violated Sections 10(b) and 20(a) of the Securities

7

Exchange Act of 1934 by making materially false and misleading statements between August 7, 2019 (when Athenex first announced Phase 3 top-line results) and February 26, 2021 (when it received the CRL) about the Phase 3 Trial results and OPE's prospects for FDA approval. Defendants moved to dismiss, arguing, among other things, that the CW allegations are too vague and lacking in foundation to support Plaintiff's claims; that each of Plaintiff's theories of falsity was flawed and factually unsupported; and that the AC failed to plead particularized facts sufficient to show that any challenged statement was false or misleading or a strong inference of scienter. Magistrate Judge Schroeder carefully reviewed all the papers for and against Defendants' MTD and correctly concluded that the AC should be dismissed in its entirety with prejudice.

## III.   LEGAL STANDARDS

A district court reviews *de novo* those portions of a R&R that are "properly objected to." Fed. R. Civ. P. 72(b)(3). A proper objection "must be specific and clearly aimed at particular findings in the magistrate judge's proposal." *McDonaugh v. Astrue*, 672 F. Supp. 2d 542, 547 (S.D.N.Y. 2009). "[W]here the party makes only frivolous, conclusory or general objections, or simply reiterates her original arguments, the Court reviews the [R&R] only for clear error." *Ravi v. Citigroup Glob. Mkts. Holdings, Inc.*, 2022 WL 92775, *1 (S.D.N.Y. Jan. 10, 2022). Moreover, courts in this circuit consistently refuse to consider arguments and caselaw "which could have been, but were not, presented to the Magistrate Judge in the first instance." *Wright v. Duncan*, 31 F. Supp. 3d 378, 428 (N.D.N.Y. 2011); *United States v. Gladden*, 394 F. Supp. 3d 465, 480 (S.D.N.Y. 2019) (quoting *Hubbard v. Kelley*, 752 F. Supp. 2d 311, 313 (W.D.N.Y. 2009)).

Here, Plaintiff raises several new arguments and authorities that were not presented to the magistrate judge, and also has failed to "include with the objections . . . a written statement either certifying that the objections do not raise new legal/factual arguments, or identifying the new arguments and explaining why they were not raised to the Magistrate Judge," as required by Local

Rule 72(c). This rule serves an important purpose: as the R&R warned, "[t]he district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not presented to the magistrate judge in the first instance" (R&R 35), and LR 72(c) ensures that the court and the parties are clear about which, if any, arguments in an objection fall into this category. Here, Plaintiff has not identified the new arguments as such or made any effort to justify them, and for this reason alone they should be rejected. Regardless, each new argument—like all of Plaintiff's other arguments—fails on the merits, as discussed below.

## IV.    ARGUMENT

As the R&R correctly described (and Plaintiff does not dispute), heightened pleading standards govern each of Plaintiff's claims. R&R 17-18. Under Section 10(b), a plaintiff must plead a materially false or misleading statement, scienter, and loss causation. *Id.* at 17. "The first two elements must be pled with heightened specificity pursuant to the Private Securities Litigation Reform Act of 1995 and [FRCP] 9(b)." *Id.* Plaintiff must (1) "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading"; and (2) "state with particularity facts giving rise to a strong inference" of scienter. 15 U.S.C. §§ 78u-4(b)(1)(B)-(b)(2)(A). A "strong inference" is "more than merely plausible or reasonable"; it must be "powerful" and "at least as compelling as any opposing inference." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314, 323 (2007). For both falsity and scienter, courts must consider the full factual context of the statements and conduct in a holistic analysis. *Id.* at 323-24; *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 190-91 (2015).

### A.  R&R Correctly Found Plaintiff Failed to Plead a False or Misleading Statement.

#### 1.  Each of Plaintiff's Theories of Falsity Fails for Lack of Factual Support.

The AC relies on the vague allegations of three CWs to show that each of the challenged statements was false or misleading due the same four alleged "undisclosed risks": that (1) seeking

9

approval via the § 505(b)(2) pathway "without the FDA's prior authorization" created a significant risk of rejection; (2) "CMC changes" between the Phase 3 Trial and OPE's Phase 1 and 2 trials created a similar risk; (3) "the protocols for the evaluation of Trial data injected the potential for bias into the BICR process and risked undermining the certainty and reliability of the data"; and (4) "there was a significant risk that the FDA would recommend a new clinical trial of patients representative of the U.S. population." AC ¶¶ 89, 101, 105, 113, 117, 125, 136, 142, 146, 153, 156-57. But, as the R&R correctly concluded, the CW allegations are too vague to establish any of these allegedly undisclosed risks and "plaintiff stops short of alleging any *facts* that show that any individual defendant knew of these concerns." R&R 15, 18-24 (emphasis in original).

With respect to the first two "risks," the R&R found that "the factual allegations supporting these two theories are fatally vague." R&R 21; MTD Mem. 11-13. Both theories depend primarily on the allegations of CW2—a Senior Regulatory Staffer at Athenex from mid-2018 until the Fall of 2019, who claims to have expressed concern during her employment about "comparability issues," both as between clinical data for OPE and FDA-approved IV paclitaxel, and between the earlier and later OPE clinical trials. AC ¶¶ 45-50, 53. She allegedly discussed these concerns with outside consultants and attended meetings (not attended by Defendants) where these issues were discussed. AC ¶¶ 46-48. And she claims that "by approximately mid-2019" (shortly before she left) these issues "were escalated" to a senior leadership committee that included Defendant Kwan, and "were also raised" at an executive meeting in fall 2019, though she offers no personal-knowledge basis for either of these vague assertions. AC ¶¶ 49-50, 53. As the Magistrate Judge correctly found, "CW2 does not allege that she ever spoke to any individual defendant or that she has any personal knowledge of what they did, or did not, know or believe regarding use of the § 505(b)(2) pathway. Vague assertions that defendants were 'aware' of these issues are insufficient."

10

R&R 21 (quoting *Glaser v. The9, Ltd.*, 772 F. Supp.2d 573, 592 (S.D.N.Y. 2011)); *see also Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 305 (S.D.N.Y. 2019) (CW allegations must be sufficiently detailed "to support the probability that a person in the position occupied by the source would possess the information alleged"). Likewise, the R&R rejected CW3's allegations (whose position and period of employment are not alleged)—expressing his conclusory "professional opinion" that Athenex "had not conducted sufficient bridging studies given the major changes to CMC practices" (AC ¶ 54)—finding that they were equally insufficient to undercut any statement or suggest that any Defendant was aware of any such undisclosed CMC risks. R&R 22.

The Magistrate Judge reached the same conclusion with respect to the third and fourth "undisclosed risks" as well. R&R 22-23; MTD Mem. 14-15. The AC's only allegation regarding conducting the trial outside the U.S. is CW2's conclusory assertion that this was "widely discussed" and that "Defendants Kwan and Lau were aware of [it] as well." *Id.* ¶ 56. And the risk of bias theory rests entirely on two conclusory sentences from CW1—a "former Clinical Research Associate at Athenex who worked exclusively on the Phase 3 Trial" (when and in what capacity is not alleged)—who vaguely claims that there were "many conversations" between the trial sites and "the BICR firm" about "the size of tumors and whether a patient qualified to remain in the Phase 3 Trial" and that this "had the potential" to introduce bias into the independent review process. AC ¶ 61; MTD Mem. 14. "Again, however, plaintiff makes no allegation regarding any defendant's knowledge of this alleged concern." R&R 23. Thus, the Magistrate Judge correctly concluded that "even assuming the truth of [all of] these confidential witnesses' factual assertions, their accounts merely reflected [their] subjective views of how the company should have managed the alleged challenges, not that any of the Defendants' statements were inaccurate at the time they were made or that any defendant believed those statements to be inaccurate when made." R&R 23.

11

In response, the Objection largely repackages the Opposition, quoting the AC's CW allegations and asserting that they are "highly specific" and demonstrate that the risks were "widely discussed and provided to key leadership within Athenex—including to Defendant Kwan himself." Obj. 13. This is untrue, as the R&R correctly found. No CW claims to have interacted with any Defendant at any time.[6] CW2's allegations include certain (irrelevant) "detailed information" (Obj. 16), but they are "fatally vague" on what actually matters—what, if anything, any Defendant knew about the allegedly undisclosed risks and when. *See, e.g.*, *Campo v. Sears Holdings Corp.*, 371 F. App'x 212, 217 (2d Cir. 2010) (CW allegations insufficient where they did not allege "whether [defendants] actually accessed or reviewed [the information]"); *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 579-80 (S.D.N.Y. 2014) (CW allegations insufficient because "it is the facts known to, and the intent of, the maker of the statements which is ultimately relevant"). The allegations that CW2 discussed "comparability issues" with non-defendant executives and prepared slide decks prior to her departure in mid-2019 say nothing about what any Defendant knew about those same risks at any particular time; indeed, they do not even establish that those risks existed at any point during the class period. *See, e.g.*, *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 352 (S.D.N.Y. 2011) ("[A]llegations about an unspecified time period cannot supply specific contradictory facts available to Defendants *at the time* of an alleged misstatement.").

Plaintiff accuses the R&R of "incorrectly dismiss[ing] [CW2's allegations] based on [her] departure . . . in the fall of 2019," arguing that CW2 was (just barely) still at the Company when the Phase 3 Trial was completed, and that reliance on the § 505(b)(2) pathway did not change after her departure. Obj. 16. But none of that fixes the fundamental deficiency in CW2's allegations—

[6] The AC's introduction states that "[CW2] attended and made presentations at multiple meetings with . . . senior leadership, including Defendant Kwan" (¶ 8), but this appears to be an incorrect summary of CW2's later allegations, which do *not* describe any such meetings. *Id.* ¶¶ 45-50, 53.

12

she cannot speak to what any Defendant knew or when. CW2 does not describe ever personally interacting with any Defendant, and because CW2 left Athenex at the beginning of the class period, she has no basis for knowing how the Company addressed the issues she allegedly raised, whether the version of the NDA ultimately submitted to the FDA a year later implicated any CMC- or pathway-related "comparability issues," or what any Defendant knew when they made the challenged statements during the class period. *Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 799-800 & nn.19-21 (S.D.N.Y. 2020) (collecting cases where CW allegations disregarded as "insufficiently particular" or unable to "situate in time relevant occurrences"); *Gregory v. ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372, 409 (S.D.N.Y. 2018) (disregarding CW allegations "unmoored in time"), *aff'd*, 757 F. App'x 35 (2d Cir. 2018).

Plaintiff argues that the R&R also "improperly dismissed the information provided by CW1" and CW3 (Obj. 15-16), but their allegations are so vague and conclusory that even taking them as true does not undercut any challenged statement. Because CW1 does not allege when any "conversations" between doctors at the trial sites and "the BICR firm" took place, how he knows this, who exactly was involved, what was discussed, whether the conversations were pursuant to or in violation of Trial protocols, or if or when any Defendant knew about these conversations, his bare allegation that "conversations" took place cannot undercut the truth of any challenged statement.[7] Likewise, CW3[8] offers no information as to his knowledge basis, when or for what purpose he reviewed "proposed CMC literature," or any other reason to infer that he was in a

---

[7] The mere fact that the FDA later raised a concern about potential bias (and Athenex looked into it), does not show there was any bias in the Trial protocol, or that Defendants were aware of or concerned about potential bias when they made the challenged statements.

[8] Plaintiff offers to plead CW3's role and dates of employment in a new complaint, but the deficiencies in CW3's allegations go well beyond basic employment facts. Unless CW3 has a personal-knowledge basis for alleging what Defendants knew about the allegedly undisclosed risks at particular times during the class period, repleading is futile. *See Schiro*, 396 F. Supp. 3d at 305.

13

position to know the sole, conclusory allegation he levels: that Athenex "had not conducted sufficient [CMC-related] bridging studies" (time unspecified). AC ¶ 54.

Plaintiff argues that the R&R erred "by improperly viewing each of the CW's accounts in isolation" rather than considering them holistically with the other allegations in the AC. Obj. 17. But simply combining CW2's vague allegations with CW1's and CW3's vague allegations (none of which are situated in time or tied to any Defendant) does not magically transform them into particularized, probative allegations—zero times zero equals zero. The R&R carefully examined all the allegations in the AC, separately and together, in the context of the full record—including Athenex's express "warn[ings] that rejection of the [OPE] NDA was possible and that it would substantially harm Athenex's business"—and concluded that all four alleged "undisclosed 'risks' . . . do not give rise to a claim." R&R 24; *supra* 5-6. Plaintiff cannot show any error in this analysis.

Finally, the Objection attacks a strawman: Plaintiff argues that the R&R's recommendation rests on an erroneous finding that Plaintiff cannot show loss causation as to the first and second allegedly undisclosed risks ("comparability issues" related to use of the § 505(b)(2) pathway and CMC changes). Obj. 9-12. The R&R's analysis on this point is correct: these two theories fail because the press release announcing the CRL did not reveal any previously undisclosed truth about those alleged risks, and no facts suggest they contributed to the FDA's denial.[9] R&R 20;

---

[9] Plaintiff asks the Court to (incorrectly) infer that perhaps the non-public CRL *did* identify these two issues—even though no facts suggest this—on the theory that because Dr. Kwan said the CRL identified two "main issues" there must have been other "minor" issues, and those minor issues must have included the § 505(b)(2) pathway and CMC concerns CWs vaguely allege existed before the class period. Obj. 11-12. This is pure speculation, unsupported by any factual allegation. While Plaintiff argues the Court cannot rely on the press release's account of what issues the CRL raised (Obj. 10-12), the AC itself takes as true Athenex's description of the FDA's reasons for the CRL (AC ¶¶ 12, 75-76), none of which implicate "comparability issues." It is Plaintiff's burden to plead facts tying the allegedly undisclosed "issues" he identifies to his loss, and he simply cannot do so. *See Immanuel Lake v. Zogenix, Inc.*, 2020 WL 3820424, at *8 (N.D. Cal. Jan. 27, 2020).

*Rice v. Intercept Pharms.*, *Inc.*, 2022 WL 837114, *23 (S.D.N.Y. Mar. 21, 2022) (no loss causation where complaint "does not allege facts to support a plausible inference that the [issues Plaintiff identified] had anything to do with the FDA's decision to . . . issue the CRL.").[10] Moreover, this Court is free to adopt the R&R's analysis on this point regardless of whether Defendants chose to argue it. *See Salvani v. InvestorsHub.com, Inc.*, 628 F. App'x 784, 785 (2d Cir. 2015) (affirming *sua sponte* dismissal of § 10(b) claim for lack of reliance and causation). However, this finding was not necessary to the Magistrate Judge's conclusion; the R&R "nevertheless" found these two falsity theories also lacked sufficient factual support. R&R 21; *supra* 10-11. Likewise, it is not necessary for this Court to rule on loss causation in order to adopt the R&R and dismiss the AC.

### 2. None of the Challenged Statements Was False or Misleading.

Because the CW allegations are too vague, conclusory, and unsupported to establish any of the "undisclosed risks" Plaintiff posits, they do not suggest that any challenged statement was false or misleading. R&R 19-24 (concluding "the undisclosed 'risks' alleged by Plaintiff thus do not give rise to a claim under § 10(b)[.]"). The AC challenges four types of statements: (1) interpreting the Phase 3 Trial data and characterizing the results; (2) describing the expected timeline for NDA submission and how Defendants understood certain FDA feedback; (3) indicating that CMC preparations were proceeding smoothly; and (4) describing the Company's preparations to commercialize OPE if approved, and characterizing the market opportunity. MTD Mem. 16-22; *see also* MTD Opp. 12. The vast majority of these are opinions subject to *Omnicare*'s

---

[10] Contrary to Plaintiff's assertion (Obj. 12 n.7), *Rice* is directly on point: there, as here, the complaint failed to plead any facts supporting the plaintiff's speculation that certain issues played a role in the FDA's decision to deny the NDA. 2022 WL 837114, at *23. *Okla. Police Pension Fund & Ret. Sys. v. Teligent, Inc.*, 2020 WL 3268531 (S.D.N.Y. Jun. 17, 2020), on the other hand, is decidedly inapposite. The regulatory letters at issue in that case were publicly available and quoted in the complaint; the court merely held that the fact that the company itself had not disclosed those contents could not defeat loss causation. *Id.* at *19. Here, no facts suggest that "comparability issues" played any role in the FDA's rejection of the OPE NDA.

strong protection; many also are non-actionable "puffery." *See* R&R 24-27; MTD Mem. 16-22. And no facts demonstrate that any challenged statement was false or misleading.

**_Statements About the Phase 3 Trial and Results_ (MTD Mem. 16-18).** Plaintiff challenges a number of statements interpreting the Phase 3 Trial data and characterizing the results, including: that the "study successfully met its primary endpoint" and was "the first oral taxane" to do so (AC ¶¶ 95, 109, 116); that there "were also strong trends in [PFS] and [OS]" (¶ 108); that "[n]europathy was much less frequent with [OPE], which we believe is an important differentiating factor" (*id.*); and that, as a result, "[OPE] has demonstrated a very strong clinical profile from both efficacy and safety perspectives" (*id.*), and "we believe that we are supportive of an NDA filing" (¶ 95). *See also* AC ¶¶ 92-99, 108-09, 115-16, 119-21, 128, 132, 134-35, 139-40, 144, 148, 154-55.

These optimistic statements expressed the Defendants' subjective views and characterizations of matters open to interpretation, and thus are statements of opinion under the securities laws. *See Tongue v. Sanofi*, 816 F.3d 199, 213 (2d Cir. 2016) (analyzing statements that Phase 3 clinical data "demonstrated a 'strong and robust treatment effect,' and that 'the data are nothing short of stunning'" as opinions). As the R&R correctly found, certain of these statements also include non-actionable puffery (e.g., describing "positive data" as a "major milestone"; characterizing the Phase 3 Trial as having a "successful outcome" (AC ¶ 108); stating Defendants were "moving ahead confidently" (¶ 109) and Athenex was "well positioned to achieve [its] strategic goal" (¶ 132)).[11] R&R 24-27. And many are forward-looking statements protected under

---

[11] AC ¶ 97, 108-09, 116, 119-21, 128, 132; *Kleinman v. Elan Corp., plc*, 706 F.3d 145, 153 (2d Cir. 2013) ("[W]ords like 'encouraging' are the type of 'expressions of puffery and corporate optimism' that do not generally give rise to [claims]."); *Tongue*, 816 F.3d at 213. "The critical inquiry . . . is not whether the topic . . . was a key to corporate success, but the nature of the specific statement and whether it concretely assured investors of anything." R&R 25. The mere fact that these vague optimistic statements concerned clinical results does not make them any less puffery. To the extent Plaintiffs' out-of-circuit authorities suggest otherwise, they are not persuasive.

the safe harbor.[12]

For an opinion to be false or misleading, a plaintiff must do more than allege that it turned out to be incorrect: he must plead (1) facts showing the speaker did not actually hold the stated belief; or (2) particular and material omitted facts rendered the opinion "misleading to a reasonable person reading the statement fairly and in context." *Omnicare*, 575 U.S. at 188-89, 194. This is "no small task." *Id.* Here, no facts suggest Defendants did not genuinely believe the optimistic opinions they expressed. To the contrary: they believed the study had met its primary endpoint, demonstrating strong, statistically significant improvement in ORR compared to IV paclitaxel; it showed strong trends of improvement in the secondary survival endpoints (important for cancer studies); it showed far fewer neuropathic events, allowing for longer treatment; and Defendants (like the experts they consulted) viewed the neutropenia side effects as manageable. MTD Mem. 4-9. Moreover, as the R&R correctly found, the vague CW allegations fail to establish any of the four allegedly undisclosed risks that Plaintiff claims rendered each challenged statement misleading. R&R 21-24; *supra* 10-11. Here, as in *Tongue*, no facts suggest that Defendants' interpretation of the clinical data "conflict[ed] with the information available to them at the time," and "Defendants' statements were not misleading simply because the FDA disagreed with Defendants' interpretation of the data[.]"[13] Accordingly, the R&R correctly concluded that

---

[12] *See* AC ¶¶ 108-09, 120, 141; *Slayton v. Am. Express Co.*, 604 F.3d 758, 765 (2d Cir. 2010) (Reform Act protects forward-looking statements that are *either* (a) identified as such and accompanied by meaningful cautionary language; *or* (b) immaterial, *or* (c) not made with actual knowledge of falsity). Here, Defendants genuinely believed the forward-looking statements, and they were so identified and accompanied by meaningful cautionary language. *See* Dkt. #64-12, at 4; Dkt. #64-10, at 4; Dkt. #64-15, at 4; Dkt. #64-9, at 1, 64-78; Dkt. #64-2, at 1, 52-66.

[13] 816 F.3d at 213-14; *see also In re MELA Sciences, Inc. Sec. Lit.*, 2012 WL 4466604, at *13 (S.D.N.Y. Sep. 19, 2012) ("Plaintiffs cannot premise a fraud claim upon a mere disagreement with how defendants chose to interpret the results of the clinical trial."); *Abely v. Aeterna Zentaris, Inc.*, 2013 WL 2399869, at *6-10 (S.D.N.Y. May 29, 2013) (similar re trial design).

"defendants' opinions regarding [OPE]'s trial results and the prospects for FDA approval are not actionable." R&R 27.

**_Statements About the NDA Timeline and Interactions with the FDA_ (MTD Mem. 18-20).** The same is true for statements about Athenex's timeline for submitting the NDA (e.g., that it was "on track" for the NDA submission), and describing and interpreting feedback received from the FDA.[14] These statements too are nearly all opinions expressing the Defendants' subjective views regarding how and when they expected to move forward with the NDA, and how they understood certain FDA feedback.[15] Many of these opinion statements—expressing the Defendants' expectations about the future—also are protected forward-looking statements.[16]

The statements discussing FDA feedback fairly represented both the information communicated by the FDA to Athenex and the Defendants' opinions as to its meaning and significance, and no pleadings suggest otherwise. Plaintiff argues that the R&R erroneously found these statements insufficiently pleaded under an "undisclosed risk" theory, when in fact they were allegedly "false" for a different reason: they indicated Athenex had an "'agreement' with the FDA that it would [approve the NDA] if the primary endpoint of the [Phase 3 Trial] study was met," but this must not have been true because the study met its primary endpoint and the NDA was still rejected. Obj. 6. As an initial matter, this is an entirely new theory not alleged in the AC or argued

---

[14] AC ¶¶ 95-96, 98-99, 102-03, 106-10, 118-19, 121-29, 131, 134-35, 137, 141, 143, 145, 147, 149, 150, 152.

[15] A few statements in this category are simply true factual statements, and no pleadings suggest otherwise. AC ¶¶ 143, 147 (announcing FDA had accepted NDA with priority review, set a decision date, and decided not to hold an advisory committee meeting). Plaintiff's own authority held statements that NDA was "on track" are puffery. *Teligent*, 2020 WL 3268531, at *12.

[16] *See* AC ¶¶ 95, 102-03, 106-07, 110, 118, 119, 124, 126-29, 131, 137, 141, 145; *supra* n.12. These forward-looking statements were so identified and accompanied by meaningful cautionary language. *See* Dkt. #64-7, at 4; Dkt. #64-16, at 07-08; Dkt. #64-12, at 4; Dkt. #64-17, at 07; Dkt. #64-10, at 4; Dkt. #64-18, at 01-02; Dkt. #64-19, at 06; Dkt. #64-13, at 4; Dkt. #64-20, at 10; Dkt. #64-15, at 4; Dkt. #64-21, at 02; Dkt. #64-9, at 1, 64-78; Dkt. #64-2, at 1, 52-65.

in Plaintiff's MTD Opposition. The AC alleges (and Plaintiff argued) only that these statements were false or misleading for exactly the same reasons as every other challenged statement—the four allegedly "undisclosed risks" discussed *supra*, which the R&R correctly concluded Plaintiff failed to establish.[17] The fact that this argument was raised for the first time here and was not considered by the Magistrate Judge is, by itself, sufficient reason to reject it. *See supra* 8-9.

Regardless, there is no merit to it—the statements referencing an "agreement" were not false or misleading in context. As both the AC and Plaintiff's Opposition to the MTD acknowledge, Athenex described the FDA "agreement" referenced in the challenged statements as qualified and conditional when it was first announced on January 6, 2018. That press release stated that the FDA "ha[d] provided positive feedback on the design of the currently ongoing [Phase 3 Trial]" and "indicated that if the study meets the primary endpoint *with an acceptable Benefit/Risk profile*, it *could be* adequate as a single comparative trial *to support* registration of [OPE] in the U.S." AC ¶ 39 (emphasis added); Dkt. #64-6, at 04. The Company's 2018 10-K, filed on March 11, 2019, described this FDA feedback using precisely the same language. Dkt. #64-9, at 2, 15 (FDA indicated "that if the study meets the primary endpoint with an acceptable benefit to risk profile, it could be adequate as a single comparative trial to support registration"). Moreover, Defendants clearly explained throughout the class period that there was no guarantee the OPE NDA would be approved: even if the Phase 3 Trial met its primary endpoint, approval would necessarily be contingent on convincing the FDA that the risk-benefit profile was favorable and approval was appropriate in light of all the data. *See* R&R 9-11; *see supra* 5-6.

In the context of these warnings and clear descriptions of the FDA feedback, no reasonable investor could have been misled by the challenged statements into believing (as Plaintiff suggests)

---

[17] AC ¶ 105; MTD Opp. 4-5; *see also* AC ¶¶ 73, 101, 113, 117, 125, 136, 142, 146, 153, 156.

that the FDA had guaranteed it would approve the OPE NDA if the Phase 3 Trial met its primary endpoint. Obj. 6-7; *Omnicare*, 575 U.S. at 190-91 (whether statement was misleading always depends on full factual context, including other statements made by the defendant, other publicly available information, customs and practices of the industry, etc.). Every biotech investor knows that FDA approval is inherently uncertain and one of the biggest risks that a biotech startup faces— there is no way to know if or when an NDA will be approved. Defendants expressed strong, genuine optimism about the chances of approval in light of the Phase 3 Trial results—and they explained that optimism partly in reference to the feedback they had previously received from the FDA—but they did not promise a regulatory outcome that was, by definition, unknowable. Viewed properly in the context of Defendants' many other statements on this same subject, none of the challenged statements referencing an "agreement" with the FDA was false or misleading.[18]

***Statements About CMC Practices* (MTD Mem. 20-21).** Next, Plaintiff challenges statements about Athenex's CMC practices—the manufacturing methods, practices, and testing that ensure safety, efficacy, and consistency between batches of drug product. AC ¶ 51. As part of their regular updates, Defendants indicated that Athenex's "CMC efforts [were] all in parallel with the clinical studies" (AC ¶ 100); they had solved the CMC issues regarding drug purity and adequate supply of APIs (AC ¶¶ 104, 111; Dkt. #64-5, at 10); and they were "checking off all the preclinical CMC questions one-by-one with the FDA" and felt confident about the upcoming

---

[18] The out-of-circuit decisions Plaintiff cites are not to the contrary. In *City of Birmingham Relief & Ret. Sys. v. Acadia Pharms., Inc.*, 2022 WL 4491093, *8-9 (S.D. Cal. Sept. 27, 2022), and *In re MannKind Sec. Actions*, 835 F. Supp. 2d 797, 809-10 (C.D. Cal. 2011), the FDA denials were on the basis of study designs the companies had previously said the FDA agreed to; here, the FDA denied the NDA due to concerns about OPE's risk-benefit profile, as Athenex's previous descriptions of the FDA "agreement" had indicated it might. As for *Skiadas v. Acer Therapeutics, Inc.*, 2020 WL 3268495 (S.D.N.Y. June 16, 2020)—which, like *In re MannKind*, was not cited in Opposition to the MTD—the court there construed the challenged statements as indicating the FDA had guaranteed approval, when specific facts indicated defendants knew that was false.

submission (AC ¶ 122). No factual allegations, CW or otherwise, suggest any of these statements was false or misleading. *See supra* 9-11; R&R 21-22. Athenex was working hard throughout the class period to put together the strongest NDA package it could, including resolving any CMC issues prior to submission. Indeed, CW2's allegations reflect this effort: she describes lower- and mid-level employees raising concerns about CMC issues at meetings in mid-2019 to ensure they were addressed prior to NDA submission. She does not, however, explain what exactly the CMC-related "comparability issues" were, how they put the NDA at risk, whether they still existed when the NDA was submitted a year later, or when, how, or if any Defendant was made aware of them, and no facts suggest that any of these issues contributed to the NDA's denial. *See* R&R 22.

### *Statements About Commercialization Plans and Preparations* (MTD Mem. 21-22).

Finally, the AC challenges statements Athenex made about the ways in which it was preparing to commercialize OPE if it was approved, and its optimistic marketing projections. AC ¶¶ 112, 128, 132-33, 137-40, 145, 148-49, 151. Some of these are simply true descriptions of Athenex's preparatory steps (¶¶ 128, 132-33, 137, 148); no facts suggest Athenex was not in fact establishing supply and distribution chains, building inventory, conducting market research, hiring additional staff, and securing funding, and its quarterly filings reflect that it was spending extensively on these preparations. MTD Mem. 9 & n.8. The remainder of the statements are true and not misleading statements of opinion characterizing the market opportunity and expressing Defendants' optimistic hopes and plans for the drug if approved. Many also are non-actionable puffery[19] and/or protected forward-looking statements.[20] No facts suggest Defendants did not

---

[19] AC ¶ 132 ("encouraging" clinician feedback and "compelling" market opportunity); ¶ 139 ("exciting launch" with "the potential to be practice changing"); ¶ 148; R&R 25-27; *supra* n.11.
[20] AC ¶¶ 112, 132-33, 139, 145, 148; *supra* n.12. These were identified as forward-looking and accompanied by meaningful cautionary language. Dkt. #64-12, at 4; Dkt. #64-13, at 4; Dkt. #64-15, at 4; Dkt. #64-21, at 02; Dkt. #64-22, at 07; Dkt. #64-9, at 1, 64-85; Dkt. #64-2, at 1, 52-73.

believe these opinions or that any contemporaneous omitted fact rendered them misleading in context. *See* R&R 23-27. Rather, the record indicates the Defendants genuinely believed OPE "ha[d] the potential to be practice changing" and were prioritizing commercial preparations to ensure they were ready to capitalize on the expected opportunity as quickly and efficiently as possible. *See* AC ¶¶ 112, 132, 139.

Ultimately, Plaintiff's fraud-by-hindsight theory cannot suffice. "[W]ere plaintiff[']s version of falsity the law, a pharmaceutical company could be sued for securities fraud each and every time it received a NDA rejection." *Zogenix*, 2020 WL 3820424, at *9. The securities laws require more, and the R&R correctly recommended dismissal.

### B. The R&R Correctly Found Plaintiff Failed to Plead a Strong Inference of Scienter.

The R&R also correctly concluded that Plaintiff's claims fail for a separate reason—lack of scienter. To plead scienter, Plaintiff must state "with particularity" facts giving rise to a "strong inference" that each Defendant acted with "an intent to deceive, manipulate, or defraud" with respect to each statement. *ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009). A plaintiff must plead detailed facts showing (i) motive and opportunity for fraud, or (ii) "strong circumstantial evidence of conscious misbehavior or recklessness." *Id*; R&R 29 ("[R]ecklessness [requires] a state of mind approximating actual intent."). Either way, the strong inference "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 324. And unlike other motions to dismiss, this "inherently comparative" inquiry requires the Court to holistically weigh "plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id*. at 323-24.

Here, there is no motive, and non-fraudulent inferences abound. None of the individual Defendants sold stock at any point during the class period; indeed, three of them—Dr. Lau, Dr.

22

Kwan, and Mr. Yordon—bought stock on the open market.[21] This makes no sense in the context of the alleged fraud—why would Defendants have intentionally inflated the stock price with false optimism about OPE's prospects, bought more stock knowing the prices were artificially inflated, and then maintained their holdings beyond the FDA's decision date, if they knew OPE was unlikely to be approved? They would not have. As the R&R correctly found, "[t]his trading history cannot support a 'cogent and compelling' inference of fraudulent intent; rather, defendants' purchases of even more [] stock during the relevant period signals only confidence in the future of their company and, by extension, in the commercial success of [its drug candidate]." R&R 31-32 (quoting *Avon Pension Fund v. GlaxoSmithKline PLC*, 343 F. App'x 671, 673 (2d Cir. 2009) (no scienter where three of four defendants increased their holdings during class period and fourth did not sell)).[22] Stock purchases weigh strongly against scienter in *Tellabs*' holistic analysis. *See Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995). Similarly, "the fact that Athenex devoted substantial resources towards preparing for the launch of [OPE] in anticipation of FDA approval weighs against an inference that defendants either knew, or were reckless to the possibility that, approval would not be obtained." R&R 32. The far more compelling inference is that Defendants genuinely believed in OPE's prospects and the likelihood of approval.

Plaintiff argues that the Defendants sought to inflate the stock price to secure additional corporate financing through Athenex's September 2020 secondary public offering (Obj. 22-23), but "it is well established in this Circuit that general motives common to most corporate officers

---

[21] *See* Dkt. #64-23 (Form 4s). Dr. Lau bought regularly throughout the class period. *Id.*

[22] *See also In re MELA*, 2012 WL 4466604, at *5 (increased holdings "inconsistent with" scienter); *Ronconi v. Larkin*, 253 F.3d 423, 435 (9th Cir. 2001) (no scienter where insiders "miss[ed] the boat"); *Carr v. Zosano Pharma Corp.*, 2021 WL 3913509, at *10 (N.D. Cal. Sept. 1, 2021) ("There is no logical reason why Defendants would tell investors that they believed FDA approval was likely if they secretly knew the FDA was going to [] reject the application, especially since Plaintiffs here do not allege . . . insider stock sales . . . prior to the [CRL].").

do not constitute 'motive' for the purpose of establishing scienter." R&R 28 (citing cases); *see also Gregory*, 297 F. Supp. 3d at 414-15; *Jun Shi v. Ampio Pharms., Inc.,* 2020 WL 5092910, at *6 (C.D. Cal. June 19, 2020) ("Why would Defendants knowingly carry on a defective trial for the short-term purpose of obtaining non-dilutive financing, when this would inevitably result—after the FDA rejected the trial—in Defendants again needing more (likely dilutive) financing?").[23]

Nor has Plaintiff pleaded any circumstantial evidence showing a strong inference of scienter. "Where, as here, a plaintiff fails to allege a motive to commit fraud . . . allegations [of] conscious misbehavior or recklessness must be correspondingly greater." R&R 29; *see also Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 355 (2d Cir. 2022). This is a high hurdle that Plaintiff cannot clear. As the R&R correctly found, the CW allegations on which Plaintiff so heavily relies "do not 'connect the dots' between the alleged flaws underlying the NDA and any knowledge or recklessness on defendants' part" and therefore cannot support a strong inference of scienter. R&R 30.[24] And as discussed above, Plaintiff has not pled any "misstatements with respect to an agreement with the FDA" (Obj. 21), and cannot look to the challenged statements themselves to show scienter. *See supra* 18-21. Ultimately, Plaintiff's circumstantial allegations boil down to baseless speculation that the Defendants must have known their statements were false or misleading because approval of OPE was "critical to Athenex's future" and some Defendants said they were involved in preparing the NDA. Obj. 24. But as the R&R correctly found, and Plaintiff acknowledges, the core operations doctrine "can only provide

---

[23] Plaintiff's authorities each involved additional facts strongly suggesting scienter. *See Skiadas*, 2020 WL 3268495, at *11 (inference of scienter "bolstered" by admitted need to raise funds to remain viable); *Medina v. Clovis Oncology, Inc.*, 215 F. Supp. 3d 1094, 1125-28 (D. Colo. 2017) (detailing particularized factual allegations showing intentional misconduct).
[24] *See supra* 9-15; MTD Mem. 24-25; Reply 9-10; *Jackson v. Halyard Health, Inc.*, 2018 WL 1621539, at *9 (S.D.N.Y. Mar. 30, 2018) (CW allegations insufficient to support scienter where CWs did not claim to have interacted with defendants); *Glaser*, 772 F. Supp. 2d at 594 (same).

additional support to an inference of scienter but could not establish scienter on its own." R&R 31; Obj. 24.[25] Where, as here, "a plaintiff fails to offer 'specific factual allegations linking Defendants to the alleged fraud,' this doctrine does not satisfy the scienter requirement." R&R 31.

No CW claims to have interacted with any Defendant, to have directly shared specific information with them that contradicted any challenged statement, or to have any other basis for personally knowing what any Defendant knew or believed at any time. And while Plaintiff argues that OPE's approval was so critical to Athenex that Defendants must have known about the alleged risks to the NDA, OPE's importance makes it that much more "improbable that [the company] would stake its existence on a drug and a clinical trial that the company thought was doomed to failure." *Cozzarelli v. Inspire Pharms. Inc.*, 549 F.3d 618, 627 (4th Cir. 2008). "Viewing the allegations holistically" the R&R correctly concluded that "the 'most cogent inference' is that the individual defendants believed that, while the FDA approval process was inherently uncertain, their NDA for [OPE] was strong, stood a very good chance of approval, and would enable Athenex to launch what they expected to be an effective and profitable drug. Plaintiff's attempt to leverage the fact that defendants turned out to be wrong into a securities claim is simply 'fraud by hindsight." R&R 33. Because Plaintiff cannot plead any facts suggesting scienter, and the record reflects Defendants' good faith, the Court should adopt the R&R and dismiss the AC with prejudice.[26]

## V.    CONCLUSION

The AC fails to plead a claim, and re-pleading cannot fix its fundamental deficiencies. The Court should adopt the R&R and dismiss the AC in its entirety with prejudice.

---

[25] *See also In re Axonyx Sec. Litig.*, 2009 WL 812244, at *3 (S.D.N.Y. Mar. 27, 2009); *Villare v. Abiomed, Inc.*, 2021 WL 4311749, at *24 (S.D.N.Y. Sept. 21, 2021) (core operations doctrine "cannot substitute for specific factual allegations" and is insufficient alone for scienter).

[26] Plaintiff does not object to the R&R's finding that the § 20(a) claim should be dismissed with prejudice. It should be. The § 20(a) claim fails to (i) state a § 10(b) primary violation, or (ii) allege facts showing any individual Defendant "controlled" Athenex. *See* MTD Mem. 25 n.31.

Dated:  November 3, 2023                    Respectfully submitted,

                                            **BAKER & HOSTETLER LLP**


                                    By:     */s Douglas W. Greene*_____

                                            Douglas W. Greene (*pro hac vice*)
                                            dgreene@bakerlaw.com
                                            Genevieve G. York-Erwin (*pro hac vice*)
                                            gyorkerwin@bakerlaw.com
                                            45 Rockefeller Plaza
                                            New York, NY 10111
                                            Telephone: 212.589.4200

                                            *Attorneys for Defendants*

26