**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE ATHENEX, INC. SECURITIES LITIGATION <br><br> This Document Relates To: <br><br>   All Actions. | No. 21-cv-00337 (LJV-HKS) <br><br> CONSOLIDATED CLASS ACTION |

**PLAINTIFF'S REPLY IN SUPPORT OF OBJECTION TO**
**REPORT & RECOMMENDATION**

# TABLE OF CONTENTS

I. DEFENDANTS' "AGREEMENT" WITH THE FDA WAS PLED AND ARGUED AS A FALSE AND MISLEADING STATEMENT ..................................................................1

II. THE OMISSIONS AND MISSTATEMENTS – RELATED TO THE PURPORTED FDA "AGREEMENT" AND OTHERS – WERE SUFFICIENTLY ALLEGED ..............2

    A. The FDA Agreement Was Sufficiently Alleged as an Actionable Misstatement .....2

    B. The Alleged Omissions Are Actionable ....................................................................4

III. PLAINTIFF HAS PLED A STRONG INFERENCE OF SCIENTER ..............................7

IV. THE AMENDED COMPLAINT ADEQUATELY ALLEGES LOSS CAUSATION ......8

V. PLAINTIFF'S SECTION 20(a) CLAIM SHOULD SURVIVE .......................................10

VI. PLAINTIFF HAS MADE NO NEW ARGUMENTS.........................................................10

VII. CONCLUSION ................................................................................................................10

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*City of Birmingham Relief & Ret. Sys. v. Acadia Pharms., Inc.*,
2022 WL 4491093 (S.D. Cal. Sept. 27, 2022)............................................................................3

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005) ....................................................................................................................9

*Glaser v. The9, Ltd.*,
772 F. Supp. 2d 573 (S.D.N.Y. 2011) .........................................................................................5

*Lentell v. Merrill Lynch & Co., Inc.*,
396 F.3d 161 (2d Cir. 2005) ........................................................................................................9

*Medina v. Clovis Oncology, Inc.*,
215 F. Supp. 3d 1094 (D. Colo. 2017) .......................................................................................8

*Metz v. U.S. Life Ins. Co. in the City of New York*,
662 F.3d 600 (2d Cir. 2011) ........................................................................................................5

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000) ........................................................................................................7

*Okla. Police Pension Fund & Ret. Sys. v. Teligent, Inc.*,
2020 WL 3268531 (S.D.N.Y. Jun. 17, 2020).........................................................................8, 9

*Rice as Tr. of Richard E. & Melinda Rice Revocable Fam. Tr. 5/9/90 v. Intercept
Pharms., Inc.*,
2022 WL 837114 (S.D.N.Y. Mar. 21, 2022)...............................................................................9

*Skiadas v. Acer Therapeutics Inc.*,
2020 WL 3268495 (S.D.N.Y. Jan. 16, 2020) .............................................................................8

In his Objection (ECF No. 75, "Obj."), Plaintiff identified specific grounds for rejection of the Report & Recommendation (ECF No. 74, "R&R") which recommended dismissal of his claims with prejudice: (1) the R&R's failure to address the actionable misstatements (not just omissions) alleged by Plaintiff, (2) the R&R's failure to credit the confidential witness ("CW") and other allegations supporting the alleged omissions, (3) the R&R's *sua sponte* decision, contrary to a wealth of case law and notice pleading standards, to reject two of Plaintiff's alleged omissions on the basis of loss causation, and (4) the R&R's failure to conduct a holistic analysis when examining the scienter allegations. Rather than address these arguments directly, Defendants spend most of their Response (ECF No. 77, "Resp.") erroneously contending that Plaintiff's arguments are not properly before the Court, deliberately misconstruing those arguments, or ignoring them entirely. Plaintiff submits that the R&R erred in a number of specific ways that merit its rejection, and that the Individual Defendants' Motion to Dismiss should be denied.

## I.  DEFENDANTS' "AGREEMENT" WITH THE FDA WAS PLED AND ARGUED AS A FALSE AND MISLEADING STATEMENT

As set forth in Plaintiff's Objection, one of the R&R's most significant errors was its failure to consider the false and misleading statements – not just omissions – made by Defendants, specifically with respect to Athenex's purported "agreement" with the FDA. Defendants argue that this is "an entirely new theory not alleged in the AC or argued in Plaintiff's MTD Opposition." Resp. at 18-19. But Plaintiff both argued and alleged that Defendants made false or misleading statements or omissions pertaining to a purported agreement between Athenex and the FDA. For example, Plaintiff alleged that Defendant Kwan stated that "the FDA previously provided positive feedback to Athenex that they would accept the results of this one pivotal trial for license application in the U.S. if the primary endpoint is met," and that Athenex had "already fulfill[ed] *our mutual agreement* with U.S. FDA that we met our primary endpoint." AC ¶68 (emphasis

1

added). Plaintiff also alleged that Defendant Lau stated that "the FDA already indicated . . . *in an agreement in the minutes* that . . . the ORR [Objective Response Rate] data . . . will be sufficient for them to approve the drug." AC ¶102 (emphasis added); *see also* AC ¶68 ("What [the FDA] request is the ORR, overall response rate, as defined in the protocol to reach statistical significance . . . *So we achieved already what they have asked for*.") (emphasis added). These statements, and others like them (*see*, *e.g.*, AC ¶96), were ultimately *proven* false and misleading with the FDA's denial of Athenex's NDA despite the study meeting its primary endpoint (ORR).

Moreover, Plaintiff argued that the statements regarding a purported agreement were false in his opposition to Defendants' Motion to Dismiss (ECF No. 66) ("MTD Opp.") at 17:

> Specifically, the Complaint alleges that Defendants misled investors as to the NDA's prospects through a series of statements repeated throughout the Class Period (i) touting Athenex's purported "agreement" with the FDA that it would accept the Phase 3 Trial results for license application if the primary endpoint was met . . . .

Thus, contrary to what Defendants argue, their misstatements regarding a purported agreement with the FDA were both alleged and argued before; the R&R simply failed to address them.

## II. THE OMISSIONS AND MISSTATEMENTS – RELATED TO THE PURPORTED FDA "AGREEMENT" AND OTHERS – WERE SUFFICIENTLY ALLEGED

### A. The FDA Agreement Was Sufficiently Alleged as an Actionable Misstatement

Defendants argue that even if the Court determines that Athenex's purported "agreement" with the FDA is not a new theory, "the statements referencing an 'agreement' were not false or misleading in context" because the statements were "qualified and conditional." However, as demonstrated above and in the Objection, they were not. Defendants were clear that *if* the study met its primary ORR endpoint, *then* the FDA would approve the NDA. *See* Obj. at 6-9.[1] There

---

[1] Defendants' characterization of the statement in the January 6, 2018, press release as "qualified and equivocal" falls flat. The press release doubles down on the existence of an agreement, stating that "[t]he positive US FDA feedback *would allow* an Oraxol US registration

2

were no warnings that Athenex's purported agreement with the FDA was in jeopardy or might fail to materialize. Defendants' citation to unrelated and generalized disclosures in Athenex's 2019 Form 10-K (Resp. at 5-6) regarding the process for obtaining FDA approval of drug candidates do nothing to qualify or condition these specific misstatements.

Defendants also argue that "no reasonable investor" could have been misled by their talk of an agreement with the FDA because "[e]very biotech investor knows that FDA approval is inherently uncertain . . ." Resp. at 19-20. The court in *City of Birmingham Relief & Ret. Sys. v. Acadia Pharms., Inc.*, 2022 WL 4491093, at *9 (S.D. Cal. Sept. 27, 2022) ("*Acadia*"),[2] determined otherwise when faced with similar alleged misstatements, however. *See id*. ("[T]he assertions that the FDA prospectively agreed on the 'plan' for Phase III (i.e. the Harmony Study), that Acadia subsequently 'executed that plan,' and that the FDA was 'on board' with the concept of 'approving a drug to treat [DRP]' if Acadia 'followed the plan' plausibly connote to a reasonable investor that the Harmony Study's design had been prospectively approved by the FDA and would not represent a further barrier to approval.").

Attempting to distinguish *Acadia* on its facts, Defendants argue in a footnote that "the FDA denial[] [in *Acadia*] [was] on the basis of [a] study design[] the compan[y] had previously said the FDA agreed to; here, the FDA denied the NDA due to concerns about [Oraxol's] risk-benefit profile." Resp. at 20 n.18. There are two problems with Defendants' attempt to distinguish *Acadia*, however. First, as in *Acadia*, Plaintiff here has alleged (and Defendants themselves have said) that the FDA's denial was, in fact, in part "on the basis of [a] study design[] the compan[y]

submission upon successful completion of the Phase III study," and quotes Defendant Lau as stating "***the positive feedback from the FDA on the Phase III Clinical Study Design for Oraxol . . . provides further validation of our regulatory pathway for Oraxol.***" AC ¶39 (emphasis added).

[2]     As Plaintiff noted in his Objection, the R&R failed to address *Acadia* even though it was properly attached to a Notice of Recent Decision (ECF No. 68) and can be considered by the Court.

had previously said the FDA agreed to." *See id.* Specifically, Defendants repeatedly asserted that the FDA had agreed to accept the results of this one Phase 3 Trial conducted entirely in the U.S. *as proposed* (*i.e.*, on the basis of the study designs used) if the primary endpoint was met. *See, e.g.*, AC ¶68 (Lau: "What [the FDA] request is the ORR, overall response rate, *as defined in the protocol . . . So we achieved already what they have asked for*.") (emphasis added); *id.*, ¶96 (Kwan: "[Athenex] announced in January last year *the FDA previously provided positive feedback to Athenex that they would accept the results* of this one pivotal trial for license application in the U.S. if the primary endpoint is met.") (emphasis added).

Second, though Defendants have attempted to limit the reasons for the FDA's denial of the Oraxol NDA to the drug's "risk-benefit profile" in an effort to distinguish this case from *Acadia*, Defendants' own summation of the CRL was not so narrow and pointed to the design of the study as problematic, noting that the FDA had "recommended that Athenex conduct a new[,] adequate[,] and well-conducted clinical trial in a patient population with metastatic breast cancer representative of the population in the U.S." AC ¶12.[3] *Acadia* is therefore not distinguishable.

**B.** **The Alleged Omissions Are Actionable**

*1.* *The Alleged Omissions Are Supported by Sufficiently Concrete Factual Allegations Supplied by the CWs*

Defendants spend much of their Response attacking the allegations pertaining to the three confidential witnesses identified in the Amended Complaint: CW1, a former Clinical Research Associate who worked exclusively on the Phase 3 Trial and reported on issues that could compromise the blindedness of the BICR firm's review; CW2, a Senior Regulatory Staffer at

---

[3] Defendants' statements also were emphatic that the risk-benefit profile of Oraxol as demonstrated by the Phase 3 Trial had exceeded expectations. *See, e.g.*, AC ¶¶63-71, 108 (emphasizing Oraxol's "strong trend in progression-free survival," "overall survival," and "lower incidence and severity of" neuropathy, alopecia, arthralgia, and myalgia).

Athenex who was intimately involved with Athenex's regulatory strategy, and who prepared and made presentations at meetings attended by Kwan regarding the potential pitfalls of submitting the NDA under the §505(b)(2) pathway, and who additionally provided information to senior executives, including Kwan, regarding issues related to the consistency of the Phase 3 Trial's Chemistry, Manufacturing, and Controls ("CMC"); and CW3, who reviewed proposed CMC literature that was to be included in Athenex's Oraxol NDA.

As discussed in both Plaintiff's MTD Opp. and Objection, contrary to what Defendants argue and the R&R found, the CWs' allegations *are* sufficiently specific. Together, they show the ways the undisclosed risks to approval of the NDA were communicated to senior management and specifically Kwan and Lau. *See, e.g.*, Obj. at 12-17; Pltff's Mem. At 13-16; AC ¶¶8, 49-50, 53, 56. In other words, they "show that individual defendants actually possessed the knowledge highlighting the falsity of public statements." *See Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 591 (S.D.N.Y. 2011) (cited and quoted in R&R at 21).

Defendants attempt to undermine the information provided by each of the CWs by arguing that "[n]o CW claims to have interacted with any Defendant at any time." Resp. at 12. As Defendants reluctantly acknowledge in a footnote, though, Plaintiff *did* allege that CW2 attended and made presentations at multiple meetings with senior leadership *including Kwan*. *See* Resp. at 12 n.6. This is not, as Defendants try to argue, "an incorrect summary of CW2's later allegations." *See id.* It is a well-pled allegation in Plaintiff's Amended Complaint, which the Court must take as true at the pleading stage, *see Metz v. U.S. Life Ins. Co. in the City of New York*, 662 F.3d 600, 602 (2d Cir. 2011), and which is perfectly consistent with the Amended Complaint's other allegations regarding CW2's work for, and interactions with, Athenex's senior leadership. *Compare* AC ¶8 ("In fact, CW2, a former Senior Regulatory Staffer, attended and made

presentations at multiple meetings with Athenex's senior leadership, ***including Defendant Kwan*** during which the likelihood that Oraxol's NDA would not be approved – including on these [comparability] grounds – was presented and discussed.") (emphasis added), *with id.*, ¶49 ("Indeed, CW2 reported that by approximately mid-2019 the comparability issues between the prior-approved [paclitaxel] data and the Phase 3 Trial data were escalated to ***Athenex's Executive Committee*** comprised of the Company's U.S.-based senior leadership ***including Defendant Kwan***. Specifically, CW2 . . . created a series of PowerPoint presentations outlining the serious risks to obtaining regulatory approval due to these comparability issues, and their assessment that the FDA was unlikely to approve Oraxol based on the Company's existing data.") (emphasis added), *id.*, ¶50 ("CW2 also reported that the comparability issues between the prior-approved data and the Phase 3 Trial data were also raised at a Global Team meeting attended by executives from all three of the Company's segments and ***members of the Executive Committee*** that occurred in Buffalo, New York in October 2019.") (emphasis added), and *id.*, ¶53 ("And, according to CW2, the CMC comparability issues were also raised in the Project and Global Team Meetings and featured in the PowerPoint presentations discussed in ¶¶48-50 above."). The R&R's failure to acknowledge these allegations alone would merit rejection of the R&R.

Defendants also try and discredit CW2's allegations by arguing the information is stale based on CW2's departure from Athenex in the fall of 2019, just as the R&R did. *See* Resp. at 13. Defendants' argument does not account for the point made by Plaintiff in his Objection that the NDA's success was predicated on the Phase 3 Trial that was completed by July 25, 2019, which was ***during*** CW2's tenure with the Company. *See* Obj. at 16; AC ¶¶3, 45. The Phase 3 Trial and the methodology/protocols used for it were set in stone by the time CW2 left – meaning that any deficiencies with the Trial, which were discussed prior to CW2's departure, inevitably remained

once CW2 left, and CW2, therefore, was in a position to possess the information alleged. *Novak v. Kasaks,* 216 F.3d 300, 313-14 (2d Cir. 2000). Defendants' speculation that the NDA might have contained new information remedying these defects (Resp. at 13) is completely unsupported. The Trial was not redone nor were new studies conducted after CW2 departed, which would have been necessary to address the §505(b)(2) and CMC comparability issues CW2 identified.

### 2. CW Allegations Are Not the Only Support for Plaintiff's Omissions Claims

Defendants also ignore the many well-pled allegations unrelated to the CWs which support the actionability of the omissions alleged by Plaintiff. For example, Plaintiff identified reasons beyond CW2's provided information for Defendants to have serious concerns about the use of §505(b)(2) pathway: namely, that a study of 226 §505(b)(2) NDAs approved in the five-year period from 2012 to 2016 found that FDA classification types 1 and 2, which include drugs such as Oraxol that contain a new active ingredient, were rarely submitted under that pathway, rather than §505(b)(1). *See* AC ¶45. Moreover, the legitimacy of the issues the CWs identified regarding the potential bias introduced into the BICR process and the location of the trial in Latin America was effectively confirmed by the limited information Athenex provided regarding the FDA's grounds for denial as set out in the CRL. *See* AC ¶75. And the FDA's ultimate denial of Athenex's NDA for Oraxol – following numerous assurances by Defendants that the FDA had already agreed to approve the application if the primary endpoint was met – also plainly supports an inference that the touted agreement either never existed or, if it did exist, its terms were inconsistent with Defendants' statements. *See* discussion *supra* at §II.A.

## III. PLAINTIFF HAS PLED A STRONG INFERENCE OF SCIENTER

Defendants largely repurposed the R&R's scienter conclusions without responding to the specific points in Plaintiff's Objection. Defendants never directly address the scienter implications of the purported "agreement" with the FDA, which was either nonexistent (in which case

Defendants' statements were false) or on completely different terms than Defendants claimed (in which case Defendants' statements were still false and misleading). In either scenario, Defendants had to know they were misleading the public by claiming that the FDA would agree to accept the results of the Phase 3 Trial if the primary endpoint was met. In addition, contrary to Defendants' contention, as demonstrated above, the CW allegations do "connect the dots" between the alleged flaws underlying the NDA and Defendants' knowledge or recklessness. *See* §II.B.1.

Similarly, Defendants cannot deny they had a motive to keep Athenex's stock price high while they sought funding through a second public offering, without which the company could not have continued to operate. The offering occurred and the money was needed; instead, they simply deem it irrelevant to the scienter inquiry. Resp. at 24 n.23. However, this is precisely the same motive as was present in the cases cited in the Objection that found scienter was adequately alleged. *See, e.g.*, *Skiadas v. Acer Therapeutics Inc.*, 2020 WL 3268495, at *11 (S.D.N.Y. Jan. 16, 2020); *Medina v. Clovis Oncology, Inc.*, 215 F. Supp. 3d 1094, 1128 (D. Colo. 2017). Likewise, while the core operations doctrine alone may be insufficient to demonstrate scienter, here it is not the ***only*** support Plaintiff has for scienter. *See* Resp. at 24-25. In short, a holistic analysis of the allegations in Plaintiff's Amended Complaint (which the R&R never truly conducted) shows that Plaintiff has adequately alleged a strong inference of scienter.

## IV. THE AMENDED COMPLAINT ADEQUATELY ALLEGES LOSS CAUSATION

Having never argued loss causation previously (and thereby conceding it had been adequately alleged), Defendants nevertheless urge the Court to adopt the *sua sponte* erroneous conclusion in the R&R that Plaintiff failed to plead loss causation with respect to two omissions: the risks to FDA approval caused by Athenex's use of the §505(b)(2) pathway and its CMC practices. *See* R&R at 20; Resp. at 14-15. Plaintiff is only required to satisfy Rule 8's notice pleading requirements with respect to loss causation, not Rule 9's, *Okla. Police Pension Fund &*

8

*Ret. Sys. v. Teligent, Inc.*, 2020 WL 3268531, at *19 (S.D.N.Y. Jun. 17, 2020) and "[l]oss causation is a fact-based inquiry," generally inappropriate at the motion to dismiss stage. *See Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 174 (2d Cir. 2005) (citing and quoting *Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d Cir. 2003)). *See also Dura Pharms., Inc. v. Broudo,* 544 U.S. 336, 346-47 (2005) (loss causation does not impose "a great burden upon a plaintiff.").

Here, Plaintiff has alleged more than enough. Defendants' own summary of the CRL admits there were other issues with the Oraxol NDA besides those specified in Athenex's press release, and the well-pled allegations in the Amended Complaint (both those pertaining to CWs and otherwise, *see* discussion *supra* at §II.B) make it clear that there were known and obvious issues relating to the two undisclosed risks not specifically referenced in the CRL – the CMC practices and the §505(b)(2) pathway. This is sufficient at the pleading stage to give rise to an inference that they were among the FDA's concerns. *See Teligent*, 2020 WL 3268531, at *19.[4] Defendants' continued reliance on *Rice as Tr. of Richard E. & Melinda Rice Revocable Fam. Tr. 5/9/90 v. Intercept Pharms., Inc.*, 2022 WL 837114, at *23 (S.D.N.Y. Mar. 21, 2022), is misplaced. There the court held that no causal connection had been alleged between the FDA's identification of a Newly Identified Safety Signal ("NISS") in a subset of patients with cirrhosis of the liver taking the company's drug for an already approved indication and alleged corrective disclosures

---

[4] Defendants' effort to distinguish *Teligent* fails. Contrary to Defendants' contention, Teligent's stock price did not decline in response to publication of the regulatory letters detailing the company's failures. Those letters were not publicly available and were obtained by Plaintiff's counsel through a FOIA request. Rather, Teligent's stock price declined in response to disclosures by the company that the court found were the materialization of the risk concealed by the omitted regulatory failures. *Teligent*, 2020 WL 3268531, at *19. Here, Plaintiff has alleged that the FDA's denial of the Oraxol NDA was the materialization of several undisclosed risks, including the CMC practices and the §505(b)(2) pathway. As in *Teligent*, it is immaterial that these issues were not specifically called out in Defendants' description of the CRL.

relating to an NDA for a ***different indication*** for the same drug for a different treatment population – patients with liver fibrosis ***without cirrhosis***. Here, the omitted risks all relate to a single NDA, two of the alleged omitted risks are specifically mentioned in the CRL, and Defendants own summary of the CRL alludes to other unidentified reasons supporting denial of the NDA.

## V. PLAINTIFF'S SECTION 20(a) CLAIM SHOULD SURVIVE

Defendants suggest in a footnote that the Court should dismiss Plaintiff's §20(a) claim because Plaintiff did not specifically object to its dismissal. *See* Resp. at 25 n.26. The R&R only dismissed the §20(a) claim, however, because it had already concluded that Plaintiff had failed to allege a primary violation of the Exchange Act. *See* R&R at 33. If the Court agrees with Plaintiff and allows his §10(b) claim to stand, thereby negating the R&R's sole reason for dismissing the §20(a) claim, Plaintiff respectfully submits that his §20(a) claim should also proceed.

## VI. PLAINTIFF HAS MADE NO NEW ARGUMENTS

Plaintiff inadvertently omitted the certification required by Local Rule 72(c), but now certifies (contrary to what Defendants suggest) that no new factual or legal arguments with respect to the issues raised in the motion to dismiss were raised in his Objection. *See* discussion *supra* at §I. As noted in the Certification, the only "new" argument addressed in the Objection was loss causation, which Defendants never raised in their motion to dismiss but which the Magistrate Judge addressed *sua sponte*. *See* R&R at 20; *supra* at §IV. Because this was not an argument raised by Plaintiff, but instead a response to an argument considered *sua sponte* by the Magistrate Judge, Plaintiff respectfully submits that it does not fall within Local Rule 72(c)'s scope.

## VII. CONCLUSION

For the foregoing reasons and all of the reasons stated in the Objection, Plaintiff respectfully requests that the R&R be rejected and Defendants' motion to dismiss be denied in full.

DATED: November 17, 2023

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

  */s/ Deborah Clark-Weintraub*
Deborah Clark-Weintraub
Jeffrey P. Jacobson
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Tel.: (212) 223-6444
Fax: (212) 223-6334
dweintraub@scott-scott.com
jjacobson@scott-scott.com

*Lead Counsel for Plaintiff John McKenzie*

**LABATON SUCHAROW LLP**

  */s/ Michael P. Canty*
Michael P. Canty
140 Broadway
New York, NY 10005
Tel.: (212) 907-0700
Fax: (212) 818-0477
mcanty@labaton.com

*Additional Counsel*

11